JUDGES: Hon. Carol Ann Robb, Hon. Gene Donofrio, Hon. Cheryl L. Waite
OPINION
ROBB, P.J.
*1119 {¶ 1} Defendant-Appellant Ralph "Sonny" Ash appeals his convictions in the Monroe County Common Pleas Court for murder, abuse of a corpse, and having weapons while under disability. Appellant assigns as error ineffective assistance of counsel for failing to file a suppression motion alleging the first search warrant was based on stale information. He contends the court erred in admitting ballistics testimony where the expert could not identify or exclude two firearms as having fired a bullet recovered from the victim's skull. He complains an anthropologist testified to a matter which was outside her area of expertise and which was not specified in her report. He also contests the admission of other acts evidence from three witnesses, adding confrontation clause and hearsay arguments as well. For the following reasons, the trial court's judgment is affirmed.
STATEMENT OF THE CASE
{¶ 2} Appellant and Tracey Heskett (the victim) were married for a brief time in 1998. After some time apart, they resumed a relationship which ebbed and flowed over the course of 15 years. Appellant voiced he could not "get rid of her" and said he called her "herpes" as a result. He said he "cussed her every day" calling her a "drunken whore, thieving bitch." (St.Ex. 36). The victim lived in a trailer on her mother's property, and Appellant lived in a house in the same township.
{¶ 3} On February 13, 2015, Appellant picked up the victim at her trailer. She left her phone with her aunt, who moved in with her two weeks prior. The victim later called her aunt, voicing she had to sneak Appellant's phone to make the call after he threw her out by the hair. (4 Tr. 149).[1] The victim's aunt then drove to Appellant's house to retrieve the victim.
{¶ 4} The next day, Saturday, February 14, 2015, Appellant called the victim at 4:30 a.m. He accused her of stealing his two wallets and threatened to report her to the police if she did not come over to find or return his wallets. (4 Tr. 150); (St.Ex. 36). They spoke again at 5:33 a.m. (2 Tr. 13-14). The victim left in her vehicle at approximately 6:30 a.m. Leaving her phone with her aunt, she instructed her aunt to call Appellant's phone if she did not return by 9:00 a.m. (4 Tr. 152). The victim never returned. Her aunt called Appellant's phone throughout the weekend.
{¶ 5} On Monday morning, February 16, 2015, the victim's aunt contacted the Monroe County Sheriff's Office to report the victim was missing. An officer visited Appellant's residence around 9:00 a.m. Appellant invited the officer into his house. Appellant confirmed the victim arrived at his house before daylight on the morning of February 14, 2015. (1 Tr. 304). According to Appellant: two "pipeliners" arrived in front of his house in a white company truck just after daylight and sounded the horn; when he went outside, one of the men asked if Tracey was there; and the victim walked toward the truck, passing him without making any comment. (1 Tr. 304).
{¶ 6} The victim's vehicle was in Appellant's driveway covered with two to four inches of snow. The officer found the victim's *1120 driver's license in the center console of her vehicle. Appellant's vehicle was in the driveway, and it was free from snow. Appellant opened his vehicle for the officer and consented to the officer looking around his home. The house appeared "uninhabitable" to the officer, and thus, he could not discern if anything appeared out of place. (1 Tr. 308).
{¶ 7} Appellant said the victim did not remove her coat while at his house and was wearing a turquoise-green coat, a brown knit hat, and multiple layers of clothing. (1 Tr. 305-306). The victim's aunt confirmed the victim was wearing a turquoise jacket and a brown knit hat. She noted the victim always wore multiple layers of clothing and described some of the layers the victim wore that day: a red plaid shirt, a pink shirt, other top layers, and jeans with pants underneath. (4 Tr. 153). After speaking to the victim's aunt, the officer returned to Appellant's house. This time, the officer looked upstairs where he noticed two firearms in Appellant's bedroom. (1 Tr. 315).
{¶ 8} The Sheriff's Office distributed missing person fliers, visited businesses, and went to various well sites and well pads due to Appellant's "pipeliner" story. They investigated at least three tips which did not add to the investigation: the victim's sister-in-law asked the police to check an illegal dump site; a driver saw a woman urinating next to a truck along a road; and a store employee heard a "pipeliner" make a sarcastic remark about the missing person flier. Appellant reiterated his story (about pipeliners picking up the victim) to an officer who visited him on February 20, 2015 to ascertain if he had heard from the victim. (3 Tr. 23, 28).
{¶ 9} A lieutenant became involved in the case on or about February 25, 2015. He visited Appellant to hear the story about the pipeliners. Appellant invited him into the house and subsequently pried open the frozen lid from a deep stone well near the porch so the lieutenant could check inside. (2 Tr. 45-46). Besides the disarray in the house, there was "junk," including a refrigerator, on the front porch and in the yard; in discussing the yard items, Appellant told the lieutenant the dummy hanging from his tree was supposed to be a pipeliner who broke a branch off a tree. (2 Tr. 51-52).
{¶ 10} Appellant confirmed he called the victim early on February 14, 2015, accused her of stealing his wallets, and demanded she bring back the wallets or find them. (2 Tr. 46). Yet, he said they did not look for the wallets or fight when she arrived that morning, estimating the time of arrival as 7:00 a.m. (2 Tr. 46-47). He noted they did not get along and she would often leave for a time after they fought; he claimed she would be back and she does this all the time. (2 Tr. 48).
{¶ 11} The lieutenant obtained the victim's phone records and ran Appellant's criminal history. He discovered Appellant had a West Virginia felony conviction for unlawful assault. As Appellant was not permitted to possess a firearm due to this prior conviction and the first officer to visit Appellant's house noticed firearms, a search warrant for guns was prepared. The search warrant was executed on March 11, 2015. Twelve firearms were confiscated, along with 2,000 rounds of ammunition and black powder for reloading ammunition. The officers noticed Appellant's two wallets on his nightstand. They saw a homemade whip with blood on it and noticed what appeared to be blood on a pair of jeans. A partially burned bright turquoise-green coat was spotted in a burn pile forty or fifty yards from the house. (2 Tr. 57, 81-82). A gray sweatshirt and pieces of burnt carpet were in the burn pile as well. Appellant was immediately *1121 arrested for having weapons while under disability.
{¶ 12} During his interview that day, Appellant said the guns belonged to the victim but acknowledged helping her reload the ammunition with powder. Appellant then described where he obtained the .22 caliber Ruger revolver which the police discovered behind his chair. He opined the victim left the state, noting many of the pipeliners who passed by his house were from another state. He claimed the victim invited pipeliners into his house once when he was in jail. He said the victim took his two wallets and he never got them back. He then described in detail the two stolen wallets which officers spotted on his nightstand (one had a Pittsburgh Steelers emblem embossed into brown leather and one was black leather with his identification inside). (2 Tr. 116, 118).
{¶ 13} Based on these developments, a second search warrant, seeking evidence of an assault, was executed the next day. A gun box and a box of ammunition were spotted on the ground behind a shed. The gun box contained a .38 caliber Smith & Wesson revolver, four unspent .38 cartridges, and one spent .38 cartridge. (1 Tr. 327). Bones and a belt buckle were observed among ashes in a 55 gallon drum used as a burn barrel. When the barrel was tipped over, a strong odor of fuel emanated from the contents and a charred body part was revealed; it was half of a human head and neck with one shoulder and the top of an arm still attached. (1 Tr. 319; 2 Tr. 108, 119). A red shirt was visible on the shoulder. Other bone fragments were recovered as well. An agent with the State of Ohio's Bureau of Criminal Investigation (BCI) documented what appeared to be a trail of burnt fabric pieces between the open burn pile and the burn barrel. (3 Tr. 182, 191, 197-198).
{¶ 14} The forensic pathologist performed an autopsy of the remains and discovered a bullet in the victim's left upper neck near the second cervical vertebrae. (4 Tr. 35, 48). He opined the victim was alive when shot as there was blood around the bullet. (4 Tr. 61). DNA testing showed the fluid recovered during the autopsy was consistent with the victim's DNA (one in one trillion, 519 billion). (3 Tr. 58-59, 66). A mass of three layers of clothing from the main body part recovered was examined; the forensic pathologist found blood between the layers of fabric and noticed a strong petroleum smell. (4 Tr. 45-46). The State Fire Marshal found this fabric contained gasoline. (3 Tr. 42, 44).
{¶ 15} The forensic pathologist observed the main body part was cut from the remainder of the body along a single plane in what appeared to be a single pass of a blade. (4 Tr. 30, 33). He opined the cut was made with an electrical, mechanical saw, not with a chainsaw or the brute force of a person using a handsaw or hacksaw. (4 Tr. 36-37). Other recovered remains were bone fragments which represented the upper arm, lower leg, pelvis, and spine. A piece of long bone appeared to have a chop in it as if made by a hatchet.
{¶ 16} The forensic pathologist consulted with an anthropologist as he was unsure if the fire could have caused the mark and because he was not an expert on the changing of bone color due to heat exposure. (4 Tr. 40-41, 44). The anthropologist testified to the range of colors in the bones: tan was the standard color of a bone which would have been exposed to the least heat; black meant exposure to higher heat; and white was the final (calcine) stage before ash. (4 Tr. 70-72). She noted the humerus was still tan. She confirmed the bone fragments represented all segments of the body and the main body part had been cut along one plane. As for the long bone fragment with a "penetrating"
*1122 black line, she concluded this was not due to the fire but was due to trauma caused by an implement. (4 Tr. 84).
{¶ 17} Upon receiving the coroner's report, the police obtained a third search warrant in June 2015 to look for cutting implements. Appellant had been in jail since his arrest. It appeared someone had entered his house by breaking in through the side door. Items such as a level, a machete, and a steel trap were set out. There were also missing items such as two chainsaws, some hanging photographs, and a television.
{¶ 18} Besides demonstrating the human remains were those of the victim, DNA evidence showed the blood on the whip was consistent with Appellant's (rather than the victim's) DNA. As to other items seized for potential blood evidence, some did not test positive on a presumptive blood test at the lab (jeans) and others tested presumptively positive but DNA could not be obtained (hacksaw blade, hatchet, sweatshirt). (3 Tr. 62, 71, 74, 76).
{¶ 19} A BCI firearms expert compared the .22 caliber bullet recovered from the victim with the ammunition and five of the firearms recovered during the execution of the search warrants. He testified in accordance with his report that two of the firearms could neither be identified nor eliminated as having fired the bullet recovered from the victim.
{¶ 20} Appellant was indicted for aggravated murder (with prior calculation and design) with a firearm specification, abuse of corpse, and having weapons while under disability. The jury convicted him of the lesser included offense of murder, abuse of a corpse, and having weapons while under disability. The court sentenced Appellant to fifteen years to life for murder plus three years on the firearm specification, twelve months for abuse of a corpse, and thirty-six months for the weapons offense, all to run consecutively. The within timely appeal followed.
ASSIGNMENT OF ERROR ONE: SEARCH WARRANT
{¶ 21} Appellant sets forth five assignments of error, the first of which contends:
"Appellant was denied the effective assistance of counsel, depriving him of a fair trial pursuant to both the United States and Ohio constitutions, in that counsel failed to suppress the search warrant executed on or about March 11, 2015 which was based on stale evidence."
{¶ 22} As Appellant acknowledges, defense counsel's failure to file a motion to suppress does not constitute ineffective assistance of counsel per se. State v. Brown , 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 65. The failure to file a motion to suppress is subject to the standard two-pronged analysis for evaluating claims of ineffective assistance of counsel as set forth in Strickland v. Washington , 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) : deficient performance and prejudice. State v. Spaulding , 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, citing Kimmelman v. Morrison , 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). More specifically, where a defendant complains trial counsel failed to file a suppression motion, the defendant must prove there was a valid ground to suppress the evidence in dispute. Spaulding , 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554 at ¶ 94. The defendant must also show there is a reasonable probability the result of the trial would have been different if the evidence had been suppressed. Id.
{¶ 23} As to prejudice, Appellant points to the mass of evidence against him which was derived solely from the execution of the three search warrants. He contends only the first search warrant was based *1123 upon stale information. As he points out, the second warrant was based upon evidence gained during the execution of the first search warrant, and the third search warrant was based upon evidence gained during the execution of the second search warrant. He therefore concludes if the first search warrant is invalid, then the evidence stemming from the other two search warrants would be suppressed as the fruit of the first unlawful warrant.
{¶ 24} In arguing there were valid grounds for suppression, Appellant contends the information relied upon to obtain the warrant for firearms was stale because the police did not seek a warrant soon after the first officer saw two guns at Appellant's house on February 16, 2015. Appellant emphasizes the search warrant was executed on March 11, 2015. This is 23 days from the day the officer spotted the firearms.
{¶ 25} "For a search warrant to issue, the evidence must be sufficient for the magistrate to conclude that there is a fair probability that evidence of a crime will be found in a particular place. The reviewing court then must ensure that the magistrate had a substantial basis for concluding that probable cause existed." State v. Castagnola , 145 Ohio St.3d 1, 2015-Ohio-1565, 46 N.E.3d 638, ¶ 35. Some considerations to be taken into account include "how stale the information relied upon is when the facts relied upon occurred, and whether there is a nexus between the alleged crime, the objects to be seized, and the place to be searched." Id. at ¶ 34. When reviewing the sufficiency of probable cause in an affidavit submitted in support of a search warrant, the reviewing court affords great deference to the issuing court's probable cause determination, and marginal cases are to be resolved in favor of upholding the warrant. State v. George, 45 Ohio St.3d 325, 544 N.E.2d 640 (1989), paragraph two of syllabus.
{¶ 26} In Young , the question of staleness was presented because a search warrant was based upon a statement by one witness who saw child pornography in the defendant's house three months before the warrant was issued and another witness whose information was not dated in the warrant application. See State v. Young , 37 Ohio St.3d 249, 257, 525 N.E.2d 1363 (1988).[2] The question to be answered was whether the court issuing the search warrant had "probable cause for believing the materials described could still be found where they had been observed." See id. Applying a totality of the circumstances test, the Court held: "Under the circumstances of this case, which involves an offense of a continuing nature, we believe that the facts stated in the affidavit justified a finding of probable cause at the time of the issuance of the warrant." Id. , citing Sgro v. United States , 287 U.S. 206, 210, 53 S.Ct. 138, 140, 77 L.Ed. 260 (1932). In upholding the warrant, the Court mentioned how search warrant affidavits must be tested and interpreted in "a commonsense and realistic fashion." Id. (because a "grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting"), quoting United States v. Ventresca , 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).
{¶ 27} This court has stated a search warrant affidavit must present timely information and include facts so closely related to the time of issuing the warrant as to justify a finding of probable cause at that time.
*1124 State v. Rapp , 7th Dist. No. 12 MA 117, 2013-Ohio-5384, 2013 WL 6500147, ¶ 36. At the same time, we observed: "There is no arbitrary time limit on how old information can be; the alleged facts simply must justify the conclusion that the contraband is present on the premises to be searched." Id. We listed some factors to consider when examining whether information in a search warrant's affidavit is stale: (1) the character of the offense; (2) the accused; (3) whether the item to be seized is perishable and easily transferable or of enduring utility to its holder; (4) the place to be searched; and (5) whether the information in the affidavit relates to a single isolated incident or it involves protracted or ongoing criminal activity. Id.
{¶ 28} Here, an officer saw two guns in Appellant's house under his bed (while conducting a consensual search for a missing person) on February 16, 2015. Possession of firearms is not per se illegal. Appellant's criminal history was not obtained until sometime after February 25, 2015, when the lieutenant became involved in the missing person case and visited Appellant's home.[3] Information had to be retrieved from West Virginia. This information showed Appellant was not permitted to possess firearms and was in violation of the Ohio statute defining the offense of having weapons while under disability. The search warrant was executed 23 days after the guns were observed. This appeared to be less than two weeks (possibly only 6 days) after it was learned that Appellant's possession of the guns constituted an offense. See Young , 37 Ohio St.3d at 257, 525 N.E.2d 1363 (noting "the affidavit was sworn to within one week after the witness was interviewed"). Although the search warrant was executed on March 11, 2015, the warrant may have been issued prior to this date, which would make the information even closer in time to the issuance of the warrant. The lieutenant was asked about a delay in executing the warrant, and he answered by referring to snow, poor road conditions, and the difficulty in reaching Appellant's house without four-wheel drive vehicles. (3 Tr. 43-44). See also fn. 3.
{¶ 29} In any event, 23 days would not be an inappropriate period of time under the totality of the circumstances of this case. Although guns can be transferred, they are not perishable or diminished on use and are of continuing utility to the owner. This is especially true considering the general location in the accused's house and the specific location under the accused's bed. Having weapons while under disability hidden under a bed in one's home would be closer on the spectrum to an offense of a continuing nature than to an isolated event. See Young , 37 Ohio St.3d at 257, 525 N.E.2d 1363. Notably, there was also testimony about Appellant having a room in his home which appeared to be dedicated to reloading ammunition with black powder. Considering the totality of the circumstances, the evidence observed by the officer on February 16, 2015 had not become stale information by March 11, 2015, when the warrant was executed. The existence of two guns under a bed on February 16 allowed the court to find probable cause for believing the guns could still be found in the house a few weeks later. See id.
*1125 {¶ 30} Regardless, as the state points out, there is the issue of the deficient record to support this claim on direct appeal. Besides lacking information on the date of the lieutenant's receipt of Appellant's criminal history and the date the warrant was issued, the affidavit offered to establish probable cause and the search warrant are not part of the record on appeal. "A claim of ineffective assistance of counsel in a direct appeal must be established by the evidence in the record." State v. Carter , 2017-Ohio-7501, 96 N.E.3d 1046, ¶ 78 (7th Dist.), citing State v. Hartman , 93 Ohio St.3d 274, 299, 754 N.E.2d 1150 (2001) (if a claim of ineffective assistance of counsel requires proof from outside of the record, then such claim is not appropriately considered on direct appeal), State v. Ishmail , 54 Ohio St.2d 402, 406, 377 N.E.2d 500 (1978) (the appellate court is limited to what transpired as reflected by the record on direct appeal), and State v. Gervin , 3d Dist. No. 9-15-51, 2016-Ohio-5670, 2016 WL 4608483, ¶ 23 (if the record developed at trial is inadequate to support the unraised suppression argument, the ineffective assistance of counsel fails).
{¶ 31} Where a defendant argued a search warrant was based upon stale evidence and there was no search warrant in the record, this court held: "When an appellant argues that trial counsel was ineffective for failing to file a suppression motion and the search warrant is not part of the record, we are to presume the regularity in the proceedings below and find no merit with the argument." State v. Bradley , 7th Dist. No. 11 CO 26, 2012-Ohio-5880, 2012 WL 6212841, ¶ 71, quoting State v. Kelley , 179 Ohio App.3d 666, 2008-Ohio-6598, 903 N.E.2d 365, ¶ 77 (7th Dist.). See also State v. Farris , 8th Dist. No. 84795, 2005-Ohio-1749, 2005 WL 852409, ¶ 9 ("Although there is some testimony in the record regarding the search warrant, the search warrant is not part of the record. In the absence of such evidence in the record, we must presume regularity in the proceedings below."). For these various reasons, Appellant's first assignment of error is without merit.
ASSIGNMENT OF ERROR TWO: BALLISTICS TESTIMONY
{¶ 32} Appellant's second assignment of error alleges:
"Appellant was denied due process and a fair trial pursuant to both the United States and Ohio constitutions when the trial court allowed expert testimony as to ballistics testing which was violative of Evid.R. 403."
{¶ 33} The BCI firearms expert testified the fired bullet recovered from the victim was consistent with a .22 caliber "brass washed lead round nose bullet." (3 Tr. 136). The bullet was damaged and only had a rifling imprint of one partial land for comparison. (3 Tr. 136-137, 164). The expert compared this bullet to the rifling characteristics of five of the firearms seized from Appellant's house.
{¶ 34} The .22 caliber Ruger revolver found behind Appellant's chair could not be identified as the weapon which fired the bullet, but it could not be excluded either. The rifling impression made by the Ruger was consistent with the impression remaining on the fired bullet. (3 Tr. 144, 163-164). The bullets found with the Ruger were different than the fired bullet (as they were .22 "long rifle copper washed lead hollow point bullets"). (3 Tr. 160). However, ten cartridges from a seized assortment of Appellant's ammunition exhibited a .22 caliber "brass washed lead round nosed bullet configuration." (3 Tr. 153).
{¶ 35} A .22 caliber Geco rifle produced similar class characteristics to the fired bullet but could not be identified as the fired weapon or excluded. Two other .22 caliber rifles were excluded as having fired *1126 the bullet recovered from the victim. The Smith & Wesson revolver found outside was a .38 caliber; it had to be disassembled and cleaned to make it operable (it was rusted and seized).
{¶ 36} At the January 7, 2016 pretrial, Appellant objected to the expert's testimony on being unable to exclude two of the .22 caliber firearms, stating this opinion would not be "to a reasonable degree of scientific certainty" and the jury would leap to an unwarranted conclusion from the testimony. (Pretrial Tr. 5). The trial court's January 8, 2017 judgment entry found: "If the proposed testimony reflects that one or more firearms could neither be included [n]or excluded as the possible murder weapon, it is nonetheless an expert opinion for the Jury's consideration."
{¶ 37} Defense counsel renewed his objection at trial during the expert's testimony, claiming the opinion that two firearms could not be excluded or identified cannot be rendered "to a reasonable degree of scientific certainty." (3 Tr. 142). The state responded it is an expert's opinion to conclude, based upon scientific testing and expert knowledge, that a fact cannot conclusively be determined one way or another. The court overruled the objection. (3 Tr. 143).
{¶ 38} Appellant reiterates his argument on appeal, contending the expert testimony that two firearms could not be excluded or identified cannot qualify as an expert opinion rendered to a reasonable degree of scientific certainty. He also cites Evid.R. 403(A) and urges the testimony, although relevant, should have been excluded as the probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury. He notes many guns in the world could have fired the bullet recovered from the victim.
{¶ 39} An expert is permitted to testify to observable characteristics of the evidence presented for analysis, which can include consistencies and inconsistencies, and the possibilities indicated by the evidence. See State v. D'Ambrosio , 67 Ohio St.3d 185, 191, 616 N.E.2d 909 (1993) (where the expert testified the state's exhibit could not be excluded as the murder weapon). "[E]xpert witnesses in criminal cases can testify in terms of possibility rather than in terms of a reasonable scientific certainty or probability." State v. Thompson , 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 129, citing State v. Lang , 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 77 (maintaining D'Ambrosio ) . The fact the ballistics expert could not conclude with reasonable scientific certainty that the defendant's gun fired the bullet recovered from the victim goes to the weight of the testimony, not its admissibility. See Thompson , 141 Ohio St.3d 254, 23 N.E.3d 1096 at ¶ 129 ("In the criminal context, questions about certainty go not to admissibility but to sufficiency of the evidence; they are matters of weight for the jury.")
{¶ 40} In Bayless , a ballistics expert testified the bullets which killed the victims were so damaged he could not determine whether they were fired by the gun recovered from the defendant. The expert also testified the bullets were fired by a gun with characteristics similar to the defendant's gun and were similar to bullets found in the defendant's gun. The Supreme Court called this "proper and admissible evidence." State v. Bayless , 48 Ohio St.2d 73, 111, 357 N.E.2d 1035 (1976).[4] The expert testified only as to *1127 observable characteristics of the bullets in evidence and as to findings which could be made with reasonable scientific certainty, and he did not stray into giving an opinion on the likelihood the "death bullets" were fired by the defendant's gun. Id.
{¶ 41} As discussed in more detail above, the expert testified to the rifling remaining on the recovered but damaged bullet as compared to the rifling created by Appellant's firearms. He discussed the consistencies between a partial land on the recovered bullet and the lands created by two of Appellant's firearms of the same caliber as the recovered bullet. Although he could not exclude these two firearms as having fired the bullet, he also disclosed he could not identify the bullet as having been fired by one of these guns due to the damage to the recovered bullet. He did not opine on the likelihood of one of Appellant's guns having fired the recovered bullet. In accordance with the law set forth above, the trial court was not required to exclude the testimony of the ballistics expert as to the two contested firearms merely because the expert could neither exclude nor identify these guns as firing the damaged bullet recovered from the victim.
{¶ 42} Furthermore, the firearms testing had a probative value to the state's case, and there is no indication the expert's testimony would confuse or mislead the jury or would result in unfair prejudice. See, e.g. , State v. Findley , 2d Dist. No. 7325 (Feb. 28, 1983) (rejecting the defendant's argument that his firearm "was simply one of thousands that could have fired the slugs found in the decedent" so the "prejudicial effect of this evidence far outweighed its probative value"). The admission of relevant evidence upon a challenge made under Evid.R. 403(A) is within the broad discretion of the trial court. State v. Yarbrough, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 40.
{¶ 43} Evidence does not cause unfair prejudice merely because it may damage the defendant's case due to its legitimate probative value. Lang , 129 Ohio St.3d 512, 954 N.E.2d 596 at ¶ 89 (rather the concept of unfair prejudice entails evidence which tends to suggest a decision on an improper basis). In other words, the test is not whether the prejudicial impact outweighed any probative value but whether the unfair prejudice substantially outweighed the probative value. Contrary to Appellant's argument on appeal, the trial court was not required to exclude the expert's testimony (that two of Appellants' firearms could not be excluded or identified as having fired the damaged bullet recovered from the victim) under Evid.R. 403(A). This assignment of error is overruled.
ASSIGNMENT OF ERROR THREE: EXPERT'S CREMATION TESTIMONY
{¶ 44} Appellant's third assignment of error provides:
"Appellant was denied due process and a fair trial pursuant to both the United States and Ohio constitutions when the trial court allowed expert testimony from [a forensic anthropologist] that was, admittedly, outside of her area of expertise and not included in her report."
{¶ 45} As set forth in the statement of the case, the anthropologist's testimony included: the colors represented in the recovered bones ranged from tan (which means exposure to the least heat) to black (meaning exposure to higher heat) and white (which is the calcine stage and the final stage before ash); the recovered bone fragments came from different segments of the body; the missing body parts could have been reduced to ash after being exposed to high heat; the main body part recovered had been cut along one plane;
*1128 and the penetrating black line on a long bone fragment was not caused by fire but was caused by trauma from an implement. Prior to her testimony, the prosecutor elicited background information from her, and the defense counsel expressly stated the defense had no objection to her qualifications.
{¶ 46} In the midst of her testimony, the prosecutor asked if she knew how long it would take to completely cremate a body in the funeral home setting. She responded the remains would be exposed to a heat of 2,000 degrees or more for eight or more hours, depending on the crematory and the situation. (4 Tr. 73-74). The prosecutor then asked if she had background information on how the remains were collected at the scene and asked: "If you were going to attempt to burn a body, cremate a body in an open burn pile, would you be able to create the heat necessary to do the job?" (4 Tr. 75). At this point, defense counsel objected stating the expert's report did not forewarn the defense she was going to render opinions about the duration of time it takes to burn a body. (4 Tr. 75-76). Defense counsel cited Crim.R. 16(K) and said he was unprepared to confront the expert's claim about the time it takes to cremate a body. (4 Tr. 76).
{¶ 47} The prosecutor responded by noting the expert report and her curriculum vitae indicates she has experience with bones exposed to heat based upon coloration, pointing out her report cited a source as well. (4 Tr. 77-78). The report contained a description of the remains as showing "evidence of exposure to high heat, with color ranging from tannish brown to white (Haglund, 1995)." The report also noted "extensive fragmentation, shrinking and warping from heat exposure" and said "[s]ome elements show a different fracture pattern than can be attributed to exposure to high heat." (St.Ex. 18). In addition to detailing her experience with skeletal remains and forensic case work, the anthropologist's curriculum vitae noted her prior forensic evaluation of three sets of burnt remains. (Def.Ex. C).
{¶ 48} The prosecutor also suggested if the anthropologist was incorrect on the specific topic of funeral home cremations, she could be confronted on cross-examination. The court overruled the objection. The anthropologist then answered the prosecution's last question (on whether one could create the heat necessary to cremate a body in an open burn pile) by stating she could not say for certain but believed it would be extremely difficult. (4 Tr. 79). She also stated, on cross-examination, she did not know how long it would take to burn a body in a burn barrel. (4 Tr. 114).
{¶ 49} Appellant states the trial court abused its discretion in allowing the anthropologist to testify to matters outside her area of expertise and which were not disclosed in her expert's report provided to the defense prior to trial. He states her testimony that cremation in a funeral home setting takes eight hours at 2000 degrees was unreliable because she was not an expert on this topic and this fact was not in her report, alleging a combined violation of an evidentiary rule and a criminal discovery rule.
{¶ 50} Pursuant to Evid.R. 702(A)-(C), a witness can testify as an expert if the testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; the witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; and the testimony is based on reliable scientific, technical, or other specialized information. "The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or *1129 she possesses will aid the trier of fact in performing its fact-finding function." State v. Hartman , 93 Ohio St.3d 274, 754 N.E.2d 1150 (2001). Before trial, the expert witness:
shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.
Crim.R. 16(K).
{¶ 51} The state responds by pointing out a written report and curriculum vitae were timely provided to the defense prior to trial. These documents indicated the anthropologist's experience with burnt remains. The state urges a trial court's decision on a perceived discovery issue is discretionary and the least severe sanction should be imposed if possible. See State v. Darmond , 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971 (2013) (the Lakewood rule applies to discovery violations by the state, not merely to those by a defendant), applying Lakewood v. Papadelis , 32 Ohio St.3d 1, 511 N.E.2d 1138 (1987), paragraph two of syllabus (in considering an alleged discovery rule violation, the trial court must inquire into the circumstances, including whether the violation was willful and the extent of surprise or prejudice, and must impose the least severe sanction that would be consistent with the purpose of the discovery rules). See also Crim.R. 16(L)(1) (remedy for noncompliance with rule is what the trial court "deems just under the circumstances"). The state notes defense counsel seemed prepared for the topic now contested.
{¶ 52} The state also believes the arguments surrounding the objection, including the citation to Crim.R. 16(K), did not indicate the objection was being made under Evid.R. 702 as well. An error may not be predicated upon a ruling which admits evidence unless a substantial right of the party is affected and a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context. Evid.R. 103(A)(1). The state additionally posits the witness's statement on cremation in a funeral home setting was subject to impeachment, went to the weight of the evidence on that topic, and did not prejudice the defense in any event, i.e., any error was harmless.
{¶ 53} As to the open burn pile question asked by the prosecutor, which was when the defense's objection was entered, the anthropologist did not estimate a time and thereafter clarified she did not know. As to the funeral home cremation question, which was asked prior to the open burn pile question, prejudice is not apparent considering the totality of the circumstances. We note defense counsel's opening statement predicted: "the science will tell you it takes a while to burn a human body." (1 Tr. 296). While defense counsel was arguing he was unprepared to cross-examine the witness on cremation time in a funeral home setting, he also disclosed his pretrial research indicated a crematory can cremate a body in two hours. (4 Tr. 76). Additionally, the trial court agreed to an early lunch break after direct examination of the anthropologist to permit defense counsel to research the topic before conducting his cross-examination. (4 Tr. 91).
{¶ 54} Defense counsel then thoroughly cross-examined the anthropologist. He was permitted to impeach her on the topic of cremation with the articles he found online.
*1130 He elicited: she gained her information on funeral home cremation from a funeral attendant when she attended a cremation; she was merely voicing a personal anecdote; and the focus of her research is not on cremation times. Upon learning this, no request was made to strike her prior answer as being outside her arena of expertise. Defense counsel questioned the witness on the information contained in the articles he printed regarding cremation in a crematory, which respectively stated: cremation time is typically 2-2.5 hours at 1,400 to 1,800 degrees; cremation can take from 60 minutes to more than 5 hours, and it takes time to preheat the crematory; and cremation is almost complete at 2-3 hours. (Def.Ex. B). These estimates were elicited during the anthropologist's testimony, and the court subsequently admitted the articles as evidence over the prosecution's objection. (5 Tr. 7-8).
{¶ 55} In conclusion, the trial court soundly exercised its discretion to implement a remedy it reasonably considered fitting under the circumstances and in the face of the objection. Moreover, any error in eliciting the testimony on cremation in a funeral home setting was harmless considering its context and the overwhelming evidence presented in this case. This assignment of error is overruled.
ASSIGNMENT OF ERROR FOUR: OTHER ACTS
{¶ 56} Appellant's fourth assignment of error provides:
"Appellant was denied due process and a fair trial pursuant to both the United States and Ohio constitutions when the trial court allowed other acts testimony from any one of or each of three of the State's witnesses."
{¶ 57} Appellant contends the evidence of other acts presented via the testimony of three witnesses should have been excluded as: the evidence was irrelevant under Evid.R. 401 ; it was not admitted for a proper purpose under Evid.R. 404(B) ; and the probative value of the evidence was substantially outweighed by the danger of unfair prejudice which requires exclusion under Evid.R. 403(A). See State v. Williams , 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20 (setting forth this three-step analysis). The state responds the evidence was relevant, was admitted for multiple permissible purposes under Evid.R. 404(B), and the probative value was not substantially outweighed by any unfair prejudice. The state reviews a Third District case where the court found: "the nature of the prior relationship between [the defendant] and [the victim] bore directly on whether [the defendant] had a motive to kill [the victim]. Evidence indicated the murder was the final culmination of [the defendant's] jealousy, possessiveness, and control." State v. Newcomb , 3d Dist. No. 8-01-07, 2001 WL 1504260 (Nov. 27, 2001) ("The Ohio Supreme Court has indicated that evidence of prior acts of domestic violence is admissible to show motive, intent, and absence of mistake."), citing State v. Nields , 93 Ohio St.3d 6, 10, 22, 752 N.E.2d 859 (2001).
{¶ 58} The trial court's decision on these evidentiary matters is reviewed for an abuse of discretion. See, e.g., State v. Morris , 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 19 (a decision admitting evidence of other acts into evidence under Evid.R. 404(B) is within the broad discretion of the trial court); State v. Sage , 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987) ("The admission or exclusion of relevant evidence rests within the sound discretion of the trial court."). Furthermore, "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected" and the issue is properly preserved. Evid.R. 103(A).
*1131 {¶ 59} Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio." Evid.R. 402. "Evidence which is not relevant is not admissible." Id. The other acts statute provides:
In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.
R.C 2945.59. Pursuant to rule: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). This list of exceptions is not exclusive. State v. Morris , 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 18.
{¶ 60} The rule does not bar evidence which is intrinsic to the crime being tried. See State v. Smith , 49 Ohio St.3d 137, 139-140, 551 N.E.2d 190 (1990) (evidence of other acts is admissible if it tends to prove a specific element of the crime charged). So-called "other acts" are admissible if "they are so blended or connected with the one on trial as that proof of one incidentally involves the other; or explains the circumstances thereof; or tends logically to prove any element of the crime charged." State v. Roe , 41 Ohio St.3d 18, 23, 535 N.E.2d 1351 (1990), citing State v. Wilkinson , 64 Ohio St.2d 308, 317, 415 N.E.2d 261 (1980), quoting United States v. Turner , 423 F.2d 481, 483-484 (7th Cir.1970). Consequently, a court can admit evidence of other acts which form the immediate background of and which are inextricably related to an act which forms the foundation of the charged offense. State v. Lowe , 69 Ohio St.3d 527, 531, 634 N.E.2d 616 (1994).
{¶ 61} Appellant contends the other acts testimony presented by the victim's three relatives is irrelevant and does not satisfy a permissible purpose. The state initially asks us to disregard Appellant's arguments under this assignment of error because the argument section of Appellant's brief failed to cite to the transcript or specify the testimony to which his arguments apply; that is, Appellant broadly states the argument applies to the other acts evidence presented by the victim's three relatives. Nevertheless, after discussing the objection to prior bad acts testimony, the factual history portion of Appellant's brief specifies the contested portions of each of these three witnesses' testimony with citations to the transcript. (Apt.Br. 3-4).
{¶ 62} First, Appellant contests the testimony by the victim's mother that Appellant was demeaning toward the victim throughout their relationship: the victim's mother testified she "always" heard Appellant call her daughter demeaning names and "cuss her out." (4 Tr. 123). Appellant *1132 also complains about her testimony that she attempted to assist her daughter in obtaining her keys and phone from Appellant and went to the police when her attempt was unsuccessful. (4 Tr. 126-127). She said Appellant returned the items while she was at the Sheriff's Office reporting the event. This was believed to have occurred within weeks of the victim's murder.
{¶ 63} This testimony explains why the victim would have left her phone with her aunt on the day before her murder and again on the day of her murder. It illuminated the relationship between the defendant and the victim, which is relevant to various exceptions for the admission of other acts evidence. The testimony supports motive and background as the victim's mother finally involved police in the tumultuous relationship; and according to other testimony, Appellant threatened to call the police on the victim in order to get her to come to his house the morning she went missing.
{¶ 64} In Nields , the trial court allowed a police officer to testify about his response to a domestic violence dispatch several weeks before the murder during which the victim told the officer she was afraid of the defendant and wanted him to leave her home. Nields , 93 Ohio St.3d at 10, 22, 752 N.E.2d 859. "The trial court permitted evidence of the prior act because it showed a strained relationship between the killer and victim." Id. at 22, 752 N.E.2d 859. The Supreme Court overruled the defendant's other acts argument, holding the evidence: "tended to show his motive to murder" the victim; "illustrated the tumultuous relationship between defendant and [the victim] in an incident that took place just weeks before the murder"; "tended to prove the absence of accident and was evidence suggesting intent." Id. (reiterating the evidence showed the defendant's "strained relationship" with the victim).
{¶ 65} Appellant also contends the court erred in allowing the victim's aunt to testify Appellant threw the victim out of his house by her hair the day before she went missing and demanded she come over to locate his wallets on the morning she went missing. This witness moved in with the victim two weeks before her disappearance. She heard Appellant yell at the victim and call her names such as a "thieving bitch" and a "slut." (4 Tr. 145). On the day before the victim went missing, the victim left her phone with her aunt before she left with Appellant. Thereafter, she called her aunt with Appellant's phone asking her aunt to come get her because Appellant threw her out by the hair. (4 Tr. 149). The victim's aunt testified Appellant called early the next morning accusing the victim of stealing his two wallets and ordering her to return to his house to locate them or he would report her to the police. (4 Tr. 150). The victim drove to Appellant's house but left her phone at home and instructed her aunt to start calling Appellant if she was not home by 9:00 a.m. (4 Tr. 152).
{¶ 66} As to Appellant's other acts argument, this testimony confirms the "tumultuous" and "strained relationship" was still occurring immediately before the victim went missing. See Nields , 93 Ohio St.3d at 22, 752 N.E.2d 859. It also constitutes the immediate background of the offense. This testimony was further relevant to motive. The victim's aunt had recently encouraged her niece to stand up to Appellant; she also confronted Appellant about his treatment of the victim. Appellant's threats to call the police appear to be in response to the victim's mother contacting the police about the victim's keys and phone. The testimony was also relevant to identify Appellant as the person who called the victim very early on her last morning and demanded she *1133 come to his home. The victim responded by complying with his demands, and she was never seen again. Notably, Appellant admitted he called the victim to accuse her of theft, and he admitted she in fact came to his home that morning. Furthermore, the accusations by Appellant go toward his intent and his plan. That is, the state charged Appellant with aggravated murder; it was argued his false accusations of theft and his demanding the victim come to his home to locate two wallets help demonstrate his prior calculation and design. (He told police he never found the wallets, but the police found them stacked on his nightstand.)
{¶ 67} The third relative of the victim to testify was her sister-in-law. Appellant protests the admission of testimony that she saw the victim fall for no reason, at which point the victim observed she must still be dizzy from Appellant hitting her in the head earlier in the day. This occurred the summer before the victim went missing (or possibly the prior summer). (4 Tr. 136). The sister-in-law encouraged the victim to go to the hospital or to the police, but she refused. This testimony supports the theory that the victim was being encouraged by various relatives to speak out and report Appellant to the police and thus "tended to show his motive to murder." See Nields , 93 Ohio St.3d at 22, 752 N.E.2d 859. Although further removed from the time of the murder, it also shows the "tumultuous" and "strained relationship" between Appellant and the murder victim. See id. Furthermore, Appellant's statement to the police complained the victim brought pipeliners to his house while he was away for over a month and suggested the police focus their investigation on pipeliners who were working near his house in June and July of 2013.
{¶ 68} Regarding Evid.R. 403(A), "evidence against a defendant is meant to be prejudicial; it is only unfair prejudice that concerns the court and only unfair prejudice that can substantially outweigh the probative value." State v. Smith , 7th Dist. No. 15 BE 0064, 2017-Ohio-2708, 2017 WL 1843196, ¶ 30, quoting State v. Agee , 7th Dist. No. 12 MA 100, 2013-Ohio-5382, 2013 WL 6500134, ¶ 40. This court concludes the probative value of the challenged testimony presented by the victim's three relatives was not substantially outweighed by unfair prejudice. As a result, the trial court did not abuse its discretion in permitting the challenged testimony.
{¶ 69} In addition, the court provided a limiting instruction to the jury explaining: the other acts evidence was received only for a limited purpose; they could not use it to prove the character of the defendant in order to show he acted in conformity with that character; and it could be considered only for the purpose of motive, opportunity, intent, purpose, or identity. (5 Tr. 80). We presume the jury followed this limiting instruction, which constrained the introduction of the evidence to the proper purpose and lessened any prejudicial effect. See Williams , 134 Ohio St.3d 521, 983 N.E.2d 1278 at ¶ 23-24. In Williams , the Court found the state did not offer the evidence of the defendant's abuse of another victim in order to show his abuse of the current victim was in conformity with his character. See id. Here, the evidence of abuse dealt with the same victim. Finally, even if one of the stories could be considered less temporally-related, prejudice is not apparent considering the totality of the overwhelming evidence presented in this case.
{¶ 70} At the end of this assignment of error, Appellant contends: "even if the other acts evidence is admissible under Evid.R. 404, the same must be excluded as hearsay/violative of the confrontation clause." The trial court's initial decision on a motion limine cited the Nields case. (J.E.
*1134 1/8/16). As aforementioned, the Nields Court overruled the defendant's complaint that the prosecution elicited other acts testimony from a police officer who had responded to a domestic violence call involving the defendant and the victim several weeks before the murder. Nields , 93 Ohio St.3d at 10, 22, 752 N.E.2d 859. Appellant points out that since Nields was decided, the common law forfeiture rule was placed in Evid.R. 804(B)(6) and the United States Supreme Court issued its Crawford decision excluding testimonial hearsay under the confrontation clause. On this particular point, there is no indication confrontation or hearsay issues were raised as to the police officer's testimony in Nields ; the Court was only addressing an argument under Evid.R. 404(B) with regards to the officer's testimony. See Nields , 93 Ohio St.3d at 22, 752 N.E.2d 859. The changes to other law (hearsay rules or confrontation clause precedent) would not affect the holding formulated under Evid.R. 404(B), which was applied supra to Appellant's arguments made under this rule.
{¶ 71} As to Appellant's confrontation clause argument, his suggestion the other acts evidence (about what the victim told her relatives) was testimonial hearsay is not supported by the case law. In Crawford , the United States Supreme Court held the confrontation clause prohibits the introduction of testimonial statements by a non-testifying witness (unless the witness is unavailable to testify and the defendant had a prior opportunity to conduct cross-examination). Crawford v. Washington , 541 U.S. 36, 54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Only testimonial hearsay implicates the Confrontation Clause. Davis v. Washington , 547 U.S. 813, 821, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Therefore, non-testimonial hearsay is left to the hearsay rules. Crawford , 541 U.S. at 68, 124 S.Ct. 1354.
{¶ 72} Testimonial hearsay includes prior testimony and police interrogations whose primary purpose under the totality of the circumstances is to collect evidence for trial. Id. ; Michigan v. Bryant , 562 U.S. 344, 370, 131 S.Ct. 1143, 1162, 179 L.Ed.2d 93 (2011) (as opposed to responding to an ongoing emergency situation). The same test applies to evaluate statements regardless of the status of the recipient of the statement as a law enforcement agent or a person other than law enforcement. Ohio v. Clark , --- U.S. ----, 135 S.Ct. 2173, 2181, 192 L.Ed.2d 306 (2015). In either case, a statement cannot fall within the confrontation clause unless its primary purpose was testimonial; if such primary purpose did not exist at the time the statement was made, admissibility is left to the rules of evidence. Id. at 2180-2181 (also adding: "But that does not mean that the Confrontation Clause bars every statement that satisfies the 'primary purpose' test * * * the primary purpose test is a necessary, but not always sufficient, condition for the exclusion of out-of-court statements under the Confrontation Clause.").
{¶ 73} Statements to persons other than law enforcement officers "are much less likely to be testimonial than statements to law enforcement officers." Id. at 2181 (a child's statements to her preschool teacher "clearly were not made with the primary purpose of creating evidence for [the defendant's] prosecution" under all of the circumstances). The Ohio Supreme Court ruled the declaration of the defendant's daughter to the victim's niece about the defendant's previous act of choking the declarant's mother was non-testimonial so that no Sixth Amendment violation occurred. State v. McKelton , 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 185, citing *1135 Giles v. California , 554 U.S. 353, 376, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008) ("Statements to friends and neighbors about abuse and intimidation and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules").
{¶ 74} The United States Supreme Court described certain "statements from one prisoner to another" as "clearly nontestimonial" for the purposes of the confrontation clause analysis. Davis , 547 U.S. at 825, 126 S.Ct. 2266. Likewise, this court held a declarant's statement to an old friend while both were incarcerated was not testimonial as the primary purpose was unrelated to creating evidence for a prosecution. State v. Carter , 7th Dist. No. 15 MA 0225, 2017-Ohio-7501, 2017 WL 3971664, ¶ 36, reconsideration denied, 7th Dist. No. 15 MA 0225, 2017-Ohio-8220, 2017 WL 4680826, ¶ 5.
{¶ 75} Under the circumstances of this case, the challenged statements made by the victim to her relatives were not made with the primary purpose of creating testimony for trial. Clearly, the contested statements made by the victim to her mother, her aunt, and her sister-in-law (set forth supra) were not testimonial (and thus any hearsay issues are addressed under the rules of evidence). Accordingly, Appellant's confrontation clause argument is without merit.
{¶ 76} As aforementioned, Appellant concludes with a brief hearsay argument regarding the other acts testimony reviewed above. Before turning to his specific argument (wherein he claims the forfeiture by wrongdoing hearsay exception does not apply), we review the nature of the contested testimony. (Apr.Br. 4). Initially, we point out that not all of the challenged other acts evidence was hearsay. For instance, the victim's mother witnessed Appellant act demeaning toward her daughter and heard him call her names. This was not hearsay as the witness testified to the defendant's own statements that she personally heard. See Evid.R. 801(D)(2)(a). Additionally, the victim's mother saw her daughter arrive home on foot without her car or phone. This witness personally went to Appellant's house and made demands upon him. Appellant declared to this witness that he did not have the car keys or the phone; this was not hearsay as it was the defendant's own statement. See Evid.R. 802(D)(2)(a). This witness suggested she would take the matter to the police. She then went to the police, and the items reappeared at the victim's house in the meantime. The statement attributed to the victim (Appellant returned the items) was a minimal part of the evidence and could be presumed from the witness's observations in any event.
{¶ 77} Next, we review the contested testimony of the victim's aunt. The aunt testified she heard the victim on the phone with Appellant in the early morning hours (just before she went missing). The victim said Appellant accused her of stealing his wallets and demanded she come to his home to find them or he would call the police. Essentially, the victim expressed she was going to Appellant's house to look for his wallets in order to avoid his calling the police on her. This was akin to an expression of the victim's intent, plan, and design and an expression of her motive for formulating this plan to go to Appellant's house early on the last morning of her life. See Evid.R. 803(2). This rule provides a hearsay exception for: "A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed." Regardless, Appellant admitted to police he called the victim early in the morning and made these statements, and his video interview was evidence at trial .
*1136 {¶ 78} The victim's aunt also testified about the day before the victim went missing. The aunt saw Appellant pick up the victim that day and watched the victim purposely leave her phone behind. Later, the victim called her aunt. The aunt then retrieved the victim from Appellant's house, where the victim was waiting outside (in the middle of winter). These statements are personal observations and are not hearsay. The issue is with the content of the phone call to the aunt: the victim said she was covertly using Appellant's phone and "needed" her aunt to come retrieve her because Appellant threw her out by the hair.
{¶ 79} The statement that she was secretly using Appellant's phone could be considered a present sense impression. See Evid.R. 803(1) ("A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness."). As to having her hair pulled while being thrown out of a house, the state did not specifically elicit that the victim was voicing a lingering sensation experienced, which would have been a statement of the declarant's then existing sensation, pain, physical condition, or bodily health. See Evid.R. 803(3) (exception for then existing physical condition). Yet, it appeared to be the description of an event made immediately after perception of the event and the circumstances did not indicate a lack of trustworthiness. See Evid.R. 803(1) (present sense impression exception). The statement the victim needed to leave Appellant's house was equivalent to an expression of the victim's intent, plan, and design, and she related her motive for doing so as well. See Evid.R. 803(3) (state of mind exception, which can include intent, plan, motive, design, etc). Finally, although the foundation was minimal, the entire statement appears to have the characteristics of an excited utterance, considering the event and the circumstances under which it was made (including the covert use of the Appellant's phone). See Evid.R. 803(2) ("A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.").
{¶ 80} Before alternatively analyzing the application of the forfeiture by wrongdoing hearsay exception (outlined by the state at the pretrial hearing and contested by Appellant on appeal), we review the testimony from the victim's sister-in-law contested by Appellant. After the victim fell down for no reason, the victim disclosed she was dizzy because Appellant hit her in the head with a stick earlier in the day. The witness personally observed the victim's fall. The victim's statement of dizziness was admissible under the hearsay exception in Evid.R. 803(3) as it was a statement of the declarant's then existing state of mind, sensation, physical condition, or bodily health. Appellant's issue appears to be with the victim relating the prior cause of her dizziness. In addressing whether this less temporally-related incident was permissible other acts evidence above, we alternatively found the potential prejudice from any error in admission would not have been outcome determinative due to the other overwhelming evidence presented in this case.
{¶ 81} We turn to analyze whether the forfeiture by wrongdoing provision contained in Evid.R. 804(B)(6) could be applied to any remaining hearsay as an alternate hearsay exception. Pursuant to this rule, the following is not excluded by the hearsay rule if the declarant is unavailable as a witness: "Forfeiture by Wrongdoing. A statement offered against a party if the unavailability of the witness is due to the wrongdoing of the party for the purpose of preventing the witness from attending *1137 or testifying." Evid.R. 804(B)(6) (the statement is not admissible unless the proponent gave advance written notice of an intention to introduce the statement sufficient to provide the adverse party a fair opportunity to contest admissibility).
{¶ 82} The state gave timely notice under Evid.R. 804(B)(6) and under Evid.R. 404(B) (the other acts rule, which also required notice). A pretrial hearing was held where three of the victim's relatives presented their proposed testimony. The trial court made a preliminary ruling admitting the evidence. On the morning trial was to commence, the defense filed a motion to reconsider the in limine ruling, noting the court's entry discussed Evid.R. 404(B) other acts admissibility but not Evid.R. 804(B)(6). The motion pointed out how Evid.R. 804(B)(6) not only required the defendant to have wrongfully caused the witness's unavailability but also required the defendant to have done so for the purpose of preventing her from attending or testifying. The court denied the motion to reconsider the in limine ruling on the record before jury selection.
{¶ 83} Before the victim's mother testified, the defense renewed the objection to the testimony presented at the pretrial and noted the prosecution agreed to accept an ongoing objection. (4 Tr. 116). In objecting, defense counsel provided an example of testimony presented at the pretrial by the victim's mother about the victim telling her mother Appellant kicked her leg and a physician told the victim a blood clot resulted from the injury (and gave her a shot to dissolve the clot). The state responded by noting, "we have tried to narrow" the testimony from the witnesses. (4 Tr. 117). Thereafter, the state did not elicit this story from the victim's mother at trial. Some of the other stories relayed to the court at the pretrial were not elicited at trial either.
{¶ 84} In using the forfeiture by wrongdoing hearsay exception in Evid.R. 804(B)(6), the state must show by a preponderance of the evidence (1) the defendant's wrongdoing resulted in the witness's unavailability and (2) "one purpose was to cause the witness to be unavailable at trial." State v. Hand , 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 84, 87. Appellant contests the second prong of the test. He essentially argues the use of Evid.R. 804(B)(6) is akin to saying he killed the victim for the purpose of making her unavailable to testify that he murdered her or abused her corpse.
{¶ 85} However, the absence of pending charges against a defendant at the time he killed his victim does not preclude the admissibility of the victim's statements. Hand , 107 Ohio St.3d 378, 840 N.E.2d 151 at ¶ 90 (where the murder victim's hearsay was found admissible under this exception; the trial also involved the defendant's simultaneous murder of another victim, his wife). The forfeiture by wrongdoing hearsay exception applies to "potential witnesses." Id. Additionally, the state need only show the defendant's wrongdoing which caused the declarant's unavailability "was motivated in part by a desire to silence the witness." Id. at ¶ 84, 90 (this need only be one of the defendant's various purposes). The state need not show the defendant's sole motivation was to eliminate the victim as a potential witness. Id. at ¶ 90.
{¶ 86} In one case, a trial court permitted an officer to testify in the defendant's murder trial about a recent domestic violence report made by the victim before her death. As this qualified as a testimonial statement subject to the confrontation clause, the Ohio Supreme Court applied the common law forfeiture exception to confrontation rights. The Ohio Supreme Court concluded the defendant's killing of *1138 the victim-declarant was designed to prevent her from testifying against him "in any future criminal proceedings" and constituted an exception to the confrontation clause in the trial against the defendant for murdering the declarant. State v. Fry , 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 108. Therefore, the motivation in part to silence the witness need not pertain to the very offense being tried . In other words, the forfeiture exception can be applied to the victim's hearsay statements being introduced at the trial for the victim's murder trial if part of the defendant's purpose (in making the victim unavailable through wrongdoing) was to prevent her or even merely dissuade her from testifying in a future trial.
{¶ 87} Here, a partial motive theory under Evid.R. 804(B)(6) entails: Appellant engaged in long-term abuse of the victim; he abused her the day before her death; on the morning of her death, he called in the middle of the night and demanded she come to his house; a physical altercation took place; there were indications she may finally decide to contact law enforcement; her relatives had been encouraging her to have Appellant arrested for his abuse; her aunt had recently moved in with her and confronted Appellant about his treatment of the victim; and one of his motivations for engaging in the act which precipitated or caused the victim's death was to keep her from reporting his ongoing abuse of her to police (and eventually testify on the subject of this abuse).
{¶ 88} As this motivation need not be the sole or even the main motivation, it is irrelevant that additional motives were suggested by the evidence. Furthermore, in determining Appellant's motivation in order to evaluate admissibility under Evid.R. 804(B)(6), the trial court was permitted to consider all of the evidence presented at the pretrial, even if it was not thereafter presented at trial, and was permitted to consider hearsay and other acts evidence, without regard to its ultimate admissibility . See, e.g., Evid.R. 104(A) (the trial court shall determine all preliminary questions concerning the admissibility of evidence without being bound by the rules of evidence, except those on privilege).
{¶ 89} As a ruling in limine can be reconsidered at trial, the trial court could also consider the evidence presented at trial relevant to the forfeiture by wrongdoing hearsay exception. The totality of the circumstances presented for the trial court's review can be considered. The predicate facts for applying the Evid.R. 804(B)(6) exception were proven by a preponderance of the evidence. See Hand , 107 Ohio St.3d 378, 840 N.E.2d 151 at ¶ 87. Our final review of this evidentiary issue is for abuse of discretion. Id. at ¶ 94. The trial court is in the best position to make evidentiary rulings, and an appellate court should not substitute its judgment for that of the trial judge absent an abuse of discretion. See Morris , 132 Ohio St.3d 337, 972 N.E.2d 528 at ¶ 16-19. Even if this court resorted to Evid.R. 804(B)(6) for admissibility of certain portions of the testimony of the victim's three relatives, the trial court's decision was within its discretion. For all of the aforestated reasons, this assignment of error is overruled.
ASSIGNMENT OF ERROR FIVE: CUMULATIVE ERROR
{¶ 90} Appellant's final assignment of error provides:
"The cumulative effect of the errors outlined above deprived Appellant of due process and a fair trial pursuant to both the United States and Ohio constitutions."
{¶ 91} A conviction is reversible when the cumulative effect of errors in a trial deprived the defendant of a fair trial, even though each instance of trial court error did not individually warrant reversal.
*1139 McKelton , 148 Ohio St.3d 261, 70 N.E.3d 508 at ¶ 321-322 (yet, errors "cannot become prejudicial by sheer weight of numbers"). "[I]t is not enough simply to intone the phrase 'cumulative error.' " State v. Wesson , 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 88, quoting State v. Bethel , 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 197.
{¶ 92} Assuming any errors were found to exist but were harmless, Appellant concludes the combination of harmless errors considered together would demonstrate his right to a fair trial was violated. Under Appellant's first assignment, there was no error as to the issuance of the search warrant, and counsel thus did not render ineffective assistance of counsel. Under his second assignment, there was no error admitting the ballistics testimony. As to the third assignment, the trial court committed no error in handling the anthropologist's testimony. As to the fourth assignment of error, the confrontation clause was inapplicable to the contested statements as they were non-testimonial. This left evidentiary issues. The other acts evidence was presented for permissible purposes. Some of the testimony was not hearsay, and some of it was subject to a hearsay exception. Any evidence arguably falling outside of an exception does not have an accumulated effect so as to violate Appellant's right to a fair trial. There was overwhelming admissible evidence of Appellant's guilt. In accordance, this assignment of error is overruled.
{¶ 93} The trial court's judgment is hereby affirmed.
Donofrio, J., concurs.
Waite, J., concurs.

The citations to the transcript are prefaced with the volume number. The court reporter restarted the page numbers in each volume of the transcript.

Young , which was consolidated with Osborne , was reversed on a different ground in Osborne v. Ohio , 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990) (failure to instruct on an element).

We note the prosecutor's opening statement mentioned March 5, 2015 as the date the lieutenant received confirmation of the prior felony offense of violence from West Virginia. (1 Tr. 272). At a sidebar while responding to an objection, the prosecutor explained the lieutenant's receipt of Appellant's criminal history indicated a "potential felony offense of violence. Because of that, they do their due diligence and go receive the documentation from that specific case which leads to this sentencing entry which says he's guilty of this offense." (2 Tr. 36-37).

Vacated and remanded in part on other grounds in Bayless v. Ohio , 438 U.S. 911, 98 S.Ct. 3135, 57 L.Ed.2d 1155 (1978) (only as to death penalty).