[Cite as *State v. Malvasi*, 2022-Ohio-4556.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

MICHAEL MALVASI,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 21 MA 0083**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2018 CR 584

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, Judges and Kristy S. Wilkin, Judge of the
Fourth District Court of Appeals, Sitting by Assignment.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Paul J. Gains,* Mahoning County Prosecutor, *Atty. Edward A. Czopur,* Assistant Mahoning County Prosecutor, Mahoning County Prosecutor's Office, 21 West Boardman Street, 6th Floor, Youngstown, Ohio 44503 for Plaintiff-Appellee and

*Atty. Michael A Partlow,* P.O. Box 1562, Stow, Ohio 44224 for Defendant-Appellant.

Dated: December 14, 2022

---

**Robb, J.**

{¶1}   Defendant-Appellant Michael Malvasi appeals after being convicted of multiple offenses in the Mahoning County Common Pleas Court.  He raises the following issues:  the admissibility of the accident reconstruction expert's opinion concluding the decedent was in the passenger seat at the time of the accident; the applicability of the state of mind hearsay exception to the testimony of two witnesses who heard the decedent say Appellant was the  best drunk driver he knew (to show how the decedent intended to get home from the bar); the propriety of a jury instruction on flight; and the weight of the evidence.  For the following reasons, Appellant's convictions are affirmed.

STATEMENT OF THE CASE

{¶2}   On November 18, 2017, just after 2:45 a.m., a white Mercedes crossover SUV, which was registered to Appellant's father, failed to negotiate the second portion of the S-curve heading west on Shields Road (U.S. 62) in Canfield Township.  The vehicle left the road, traveled down an embankment, hit a tree, and then rolled at least two times. Ryan Lanzo (the decedent) died at the scene from his injuries sustained in the crash.  The state believed he was the front seat passenger and Appellant was the driver.

{¶3}   A bystander passed the scene sometime after the crash occurred and called the police.  Before the police arrived, a vehicle arrived at the scene, and the decedent's body was retrieved.  Appellant's father eventually transported the decedent's body to an Austintown health care center (variously called urgent care or emergency care by witnesses).

{¶4}   On June 7, 2018, Appellant was indicted for the following offenses: aggravated vehicular homicide (a second-degree felony where the death proximately resulted from a violation of division (A) of R.C. 4511.19); an alternative vehicular homicide count (a third-degree felony where the death was caused recklessly); two counts of failure to stop after an accident (a third-degree felony where the accident resulted in a death and a second-degree felony where the defendant knew the accident resulted in a death); tampering with evidence (a third-degree felony); and operating a vehicle under the influence of alcohol and/or drugs (a first-degree misdemeanor OVI).

**{¶5}** The case was tried to a jury in July 2021. The decedent's friend, Dante, testified about their night in the hours before the crash. He went to the decedent's apartment where he consumed a mixed drink with Appellant, the decedent, and another friend. (Tr. 257-258). He also observed Appellant and the decedent smoke marijuana. (Tr. 258-259). Dante was originally planning to drive the group to some bars but decided he wanted to drink that night. When he mentioned using the services of Uber to reach the bars, Appellant said not to worry because he would drive. (Tr. 260-261). Dante testified he felt unsafe in Appellant's white Mercedes on the way to the bar because Appellant had the music on the highest volume, drove aggressively, took a turn at a high speed, and failed to make a complete stop at a traffic signal. (Tr. 262-263).

**{¶6}** At the first bar (Blue Wolf Tavern), Dante observed Appellant drink a beer; he then spent his time separate from Appellant (as he had just met him that night). (Tr. 266). The decedent drank Long Island iced tea at the bar. (Tr. 282). Eventually, Dante walked next door to another bar (Suzie's Dogs and Drafts).

**{¶7}** After Appellant arrived at the second bar, Dante saw him have one or two drinks and a shot. (Tr. 270). Near the end of the night, the decedent learned Dante would be getting a ride home from his friend Jackie and asked if he could also obtain a ride from this friend. Dante offered to call the decedent an Uber. (Tr. 270-271).

**{¶8}** At that point, Appellant said he would be leaving soon and he could take the decedent home. (Tr. 272). Dante suggested the decedent should decline the ride. The decedent replied, "don't worry. Mike's the best drunk driver I know." The decedent and Appellant thereafter walked out of the bar. (Tr. 273).

**{¶9}** Jackie testified she met Dante at Blue Wolf Tavern at 11:45 p.m. (Tr. 290-291). She said she only had one glass of wine early in the night and noticed the decedent consume three drinks at this bar. (Tr. 290, 293). She opined they left Blue Wolf Tavern for Suzie's Dogs and Drafts around 1:30 a.m. (Tr. 294). She confirmed the decedent asked for a ride at the end of the night and Dante offered to call him an Uber. (Tr. 297). Jackie also heard Appellant offer to drive the decedent home, noting Appellant seemed in a rush to leave. (Tr. 298-301). After Appellant's offer, the decedent unsuccessfully offered to pay people at her table for a ride home. (Tr. 299). She believed this occurred after the lights came on at last call around 2:30 a.m. (Tr. 301).

{¶10} A patron at Suzie's Dogs and Drafts, Lauren, testified she met Appellant on a prior occasion. When he and the decedent first sat at her table on the night at issue, Appellant seemed intoxicated. Lauren had shots of Crown Royal with Appellant. By the end of the night, he seemed "very intoxicated." (Tr. 318). Lauren was also intoxicated but said it was not to an extreme level. (Tr. 317). When they all got up to leave, Appellant fell into a table, which caused a commotion involving Appellant, the patrons at that table, and security. (Tr. 319). Opining he should not drive, Lauren used Appellant's phone to order him an Uber to his address on Timber Run Drive in Canfield. (Tr. 320-321).

{¶11} Lauren's friend, Macy, testified she watched Appellant drink beer and multiple shots. (Tr. 350). She described Appellant as acting "blacked-out drunk"; he was unable to form a sentence, slurred his words, and was unsteady on his feet. (Tr. 346). Macy said she had one beer at this bar and five beers (or less) during an earlier six-hour period. (Tr. 347). She was concerned because Appellant drove that night and asked Lauren to leave with him and the decedent. (Tr. 351). When she voiced her concerns about Appellant's intoxicated state and asked the decedent to seek a ride with Dante, the decedent said Appellant "is the best drunk driver that he knows." (Tr. 353-355). While watching a bar surveillance video on the stand, Macy pointed out Lauren using Appellant's phone and Appellant falling into a table. (Tr. 364-366).

{¶12} A resident near the scene of the crash testified he fell asleep in his den while watching television and woke at 2:46 a.m. As he stood up, he saw a vehicle heading west around the first S-curve and heard it accelerate. As he turned to leave the room, he heard a lot of noise and then a loud thud. (Tr. 438). He opened the window but could not see or hear anything, noting the crash site sits lower than the roadway. (Tr. 438-439, 441). This witness went to bed and heard about the crash the next morning.

{¶13} A passerby, who described herself as a designated driver, testified she noticed tracks leading off the road and a vehicle in a yard. (Tr. 400-401). After she dropped off her passengers and drove past the scene, she saw a different vehicle parked in a driveway and legs on the ground near the two open doors on the driver's side of the car. (Tr. 403). She stopped at Argus Park and called 911 at 3:12 a.m. (Tr. 403); (St.Ex. 4). She then turned around and drove back past the scene, but the car was no longer in the driveway. (Tr. 406).

{¶14} The first responding officer from the sheriff's department did not notice the crash when approaching from the west but found it after turning around and approaching from the east. They found no victims at the scene of the crashed white Mercedes; the fire department assisted in the search using thermal imaging cameras. (Tr. 382, 385).

{¶15} Because the vehicle was registered to Appellant's father, police officers were dispatched to the Malvasi residence on Timber Run Drive in Canfield, where Appellant lived with his parents. (Tr. 450-451, 854). A Canfield police officer testified he saw Appellant talking on the phone through the front window while another officer knocked on the door around 3:45 a.m. Appellant looked at the officer and then walked away down a hallway. They continued knocking, but the occupants would not come to the door. The officer thereafter saw Appellant peek down the hall. (Tr. 450-454).

{¶16} At 3:52 a.m., Appellant's father arrived at a health center in Austintown, Ohio with the decedent's body; he was driving a four-door Toyota sedan registered in his name. (Tr. 540, 841). There were towels and dark stains on the seat; blood was collected from inside the vehicle and from an object in the trunk. (Tr. 609, 620-621).

{¶17} A stipulation was entered into the record which stated the following: Appellant's father was asleep when Appellant woke him; he went outside where the Toyota used by his son was parked in the driveway; the decedent, who appeared unconscious, was in the backseat; and the father immediately drove the vehicle alone to St. Elizabeth's Emergency Care. (Tr. 504).

{¶18} Surveillance footage recovered from a neighboring house on Timber Run Drive showed the garage of the Malvasi residence. This video showed the following events: a car leaving the Malvasi residence at 3:09 a.m.; the car returning at 3:16 a.m.; the car leaving the residence again at 3:40 a.m.; and headlights in the drive at 3:46 a.m. (upon the arrival of the Canfield police). (Tr. 587-593). These times were calculated after the witness found the camera time was four minutes slow. (Tr. 588)

{¶19} A different surveillance video, from the house across from the Malvasi residence, showed the following events in the street: a subject walking toward the Malvasi residence from the west (from the direction of the crash) at 3:06 a.m.; a car heading east (toward the crash) at 3:10 a.m.; a car heading west (toward the house) at 3:16 a.m.; a car heading east (toward the health center) at 3:41 a.m.; and two Canfield police cruisers

approaching at 3:45 a.m. (Tr. 579-584). The times were calculated after the witness found the camera time was five minutes fast. (Tr. 505, 575).

**{¶20}** A business's surveillance camera facing the intersection of Shields Road and Route 46 recorded a figure headed west (from the direction of the crash site toward Appellant's residence) at 2:56 a.m. This footage also showed a vehicle headed east at 3:12 a.m., a vehicle headed west at 3:15 a.m., and a vehicle headed east and turning north (toward Austintown) at 3:42 a.m. (Tr. 699-704). The times were calculated after the witness found the camera time was one hour and eight minutes fast. (Tr. 696).

**{¶21}** Not long after the Canfield police officers left the Malvasi residence upon their unsuccessful attempt to make contact with Appellant, one of the officers returned for a stakeout to ensure Appellant did not leave. A highway patrol trooper, who spoke to Appellant's father at the health center, went to the house after the father called home to inquire about his son's condition and injuries. (Tr. 483, 486-487). At 5:45 a.m., the Canfield police officer knocked on the door accompanied by the trooper. (Tr. 456-457).

**{¶22}** Appellant's sister answered the door and let them in the house. Appellant's mother and sister used a key to unlock the door to Appellant's bedroom where he was sleeping and groaning. (Tr. 459-460, 488). After Appellant complained of side pain, he was evaluated by an emergency medical technician (EMT) and transported to the hospital. (Tr. 460). The Canfield police officer heard Appellant tell the EMT he smoked marijuana and drank three to four beers plus six shots. (Tr. 462).

**{¶23}** Two hours later, Appellant spoke to a trooper at the hospital. He identified the decedent and said he had no memory of the crash. He claimed the decedent was the driver, alleging the decedent started driving from the parking lot at Suzie's Dogs and Drafts. (Tr. 846). After a short break in the interview, Appellant said the decedent argued with him about driving while in the bar's parking lot. (Tr. 851). He admitted smoking weed and said his memory was lacking because of all the beer, whiskey, and tequila he drank. (Tr. 852). The trooper testified it took him seven minutes to drive 3.4 miles to the crash site from Suzie's Dogs and Drafts while traveling the speed limit. (Tr. 864). He said the drive from the crash site to Appellant's house takes approximately two minutes. (Tr. 866).

**{¶24}** The forensic pathologist testified the decedent suffered brain hemorrhaging of various types, a lacerated blood vessel at the heart, lung contusions, a lacerated liver,

hemorrhaging in the pleural cavity and abdomen, and fractured ribs and clavicle. (Tr. 518-519). The external injuries were mostly pre-death abrasions. (Tr. 522-523). She believed he died "seconds to minutes" after receiving the injuries, with five minutes being the maximum. (Tr. 520).

{¶25} An agent from the Ohio Department of Public Safety testified to his review of surveillance videos from the two bars (after the bar owners and their contracted technology representatives testified about providing the videos to law enforcement). (St.Ex. 152, 153). After viewing BMV photographs of Appellant and the decedent, this agent spotted them arriving at Blue Wolf Tavern at 11:46 p.m. (Tr. 640-641). At 12:20 a.m., Appellant was seated at the bar. At 1:24 a.m., Appellant and the decedent exited Blue Wolf Tavern. (Tr. 642). The time on the video was found to be accurate. (Tr. 639).

{¶26} The video from Suzie's Dogs and Drafts shows a white SUV entering the parking lot around 1:30 a.m. (calculated after the agent found the camera time was 14 minutes slow). (St.Ex. 153); (Tr. 651). The agent noted he could see the clothing worn by the driver and passenger as they exited the vehicle and approached the entrance to the bar. (Tr. 651-658). Macy confirmed the identity of Appellant and the decedent (including the clothing worn that night) from the video for the agent. (Tr. 349, 359, 664-665). Jackie identified the two (and their clothing) from still shots taken from the video. (Tr. 303-304). Appellant can be seen in the bar with the decedent and other witnesses.

{¶27} Just prior to exiting the bar, Appellant stumbled into his own table. While walking toward the door, he staggered to the side, knocked over a chair, and landed on a seated male patron while causing the patron's table to move from its position. The decedent had to pull him off the patron. The outside video thereafter shows Appellant and the decedent exit the bar and walk to the white SUV where it can be discerned that the decedent entered the front passenger side of the vehicle and Appellant entered the front driver's side of the vehicle. The agent also testified to this observation. (Tr. 663). The car drove away at 2:39 a.m.

{¶28} The jury also watched videos Appellant posted to Snapchat earlier in the night. (St.Ex. 151). The first video clip had a 9:25 p.m. timestamp and showed Appellant drinking a shot of Crown Royal; the next clip in the sequence showed him do another shot, spilling some down his chin. Another clip was shot from inside a vehicle stopped at

a red light with the camera held at a position near the center armrest, which allowed the viewer to see the Mercedes emblem on the steering wheel and the vehicle's clock reading 10:06; the camera then turned to show Appellant singing to the music.  (Tr. 713-715).

**{¶29}** A knit hat with an Arctic Cat logo was found on the driver's seat of the wrecked Mercedes.  (Tr. 686-687, 900).  The still shot taken from the bar video showed Appellant wearing a knit cap with an emblem on it.  (Tr. 900).  A phone attributed to the decedent was found between the driver's seat and the driver's door of the Mercedes.  (Tr. 594, 613).

**{¶30}** The accident reconstruction expert testified the crash occurred at the second 45-degree turn heading west on Shields Road after Argus Park.  At the curves, there were warning signs, an overhead light, and a suggested speed of 25 mph.  (Tr. 744). The expert documented three tires marks beginning on the road and leading off the north side of the road into the grass and down an embankment.  He explained the tracks showed the vehicle did not drive straight off the road at the curve but tried (and failed) to negotiate the curve.  (Tr. 745).  He believed the vehicle was traveling at 43 to 45 miles per hour through the crash site if it was not braking and 60 to 65 miles per hour if it had the brakes locked, but he did not believe the brakes were locked due to the curvature of the tire marks.  (Tr. 787-788).

**{¶31}** Ninety feet after the vehicle started through the grass, its right side near the front corner hit a pine tree (standing 17 to 20 feet in height), shearing the tree off at the base and uprooting the stump.  (Tr. 746, 748).  The vehicle then overturned, striking the ground very hard on its left side and rolling at least twice while in the grass and then probably again over a gravel driveway.  (Tr. 746-747, 797-798, 812).  Evidence of the overturns included missing tire marks, the gouges in the grass, the debris field, and the condition of the vehicle (including dirt on certain parts of the vehicle and the missing driver's side mirror).    (Tr. 747, 830).  The vehicle landed upright on its wheels on the other side of the gravel driveway (facing the direction from which it was originally driving on the road).  The expert said the debris field and crash scene spanned roughly 280 feet.  (Tr. 747).

**{¶32}** The dashboard showed evidence of impacts with the occupants; their denim pants left imprints, which indicated they were not wearing seatbelts.  (Tr. 776).  The

imprint on the driver's side was under the steering wheel. There was a separate imprint on the passenger side, which seemed to slide up the dashboard (where the glove compartment met the console). (Tr.768-769). The expert explained the occupants were thrown to the left, toward the driver's side, as the vehicle rolled upside down. (Tr. 797-798, 801-802, 813).

{¶33} The side airbags were deployed. The driver's window was missing, but the expert said an ejection through the driver's window during the roll was unlikely due to the door and the deployed side airbag, which had dirt on the outside. (Tr. 749, 798). The rear window was missing, but a cargo cover was crushed into the space, which blocked that potential ejection route.

{¶34} The sunroof was expelled from the top of the vehicle, and there was damage to the left rear sunroof frame. For instance, the fabric around the interior sunroof corner indicated an impact with and abrasion by an object being ejected through the hole in the roof. (Tr. 750). The outside of this sunroof corner was free of mud and sod, suggesting someone was caught between the roof and the grass as the vehicle rolled. (Tr. 777). One of the injuries running down the decedent's left leg was angled in a shape matching the sunroof's angled support arm. (Tr. 775-777). The spacing between the injuries at the bottom of the decedent's leg and pant leg corresponded to the layout of the sunroof frame. (Tr. 782, 798-799). The expert opined to a reasonable degree of scientific certainty the decedent had been in the passenger seat and was then thrown to the left through the sunroof. (Tr. 797).

{¶35} The jury found Appellant guilty as charged with the exception of the second-degree felony leaving the scene of an accident charge, which was decreased to a third-degree felony due to a special finding that Appellant did not know the accident resulted in a death when he left the scene. The court sentenced Appellant to consecutive sentences of eight years on count one, two years on count three, and two years on count five, for a total sentence of twelve years. He received a concurrent sentence for the misdemeanor OVI, and the other two counts were merged. The court imposed three years of mandatory post-release control and a mandatory lifetime driver's license suspension. The within timely appeal followed.

Case No. 21 MA 0083

## ASSIGNMENT OF ERROR ONE:  EXPERT OPINION

**{¶36}** Appellant sets forth four assignments of error, the first of which provides:

"THE TRIAL COURT ERRED IN PERMITTING TROOPER CHRISTOPHER JESTER TO TESTIFY CONCERNING HIS OPINION THAT APPELLANT HAD BEEN DRIVING THE CAR AT THE TIME OF THE ACCIDENT AND THE DECEDENT HAD BEEN A PASSENGER IN THE CAR."

**{¶37}** Before trial, Appellant filed a motion in limine seeking to preclude the opinion of the state's accident reconstruction expert and asking for a pre-trial hearing on the issue.  The expert testified at a hearing on October 16, 2021, and the court overruled Appellant's motion.  (10/19/20 J.E.).  At trial, defense counsel renewed his motion as to the expert, and the court overruled the motion again.  (Tr. 730-731).

**{¶38}** On appeal, Appellant first contends this witness was not properly qualified as an expert in accident reconstruction as required by Evid.R. 702(B).  He suggests the witness may have been an expert in accident investigation but lacked sufficient training or experience in accident reconstruction.

**{¶39}** A witness who testifies as an expert must be "qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony * * *."  Evid.R. 702(B).  "Neither special education nor certification is necessary to confer expert status upon a witness. The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function."  *State v. Hartman*, 93 Ohio St.3d 274, 285, 754 N.E.2d 1150 (2001).  *See also State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 127 (the witness need not be the best witness on the subject to be qualified as an expert).

**{¶40}** The determination of an expert's qualifications to testify on a particular subject is within the sound discretion of the trial court and reviewable only for an abuse of discretion.  *State v. Jones*, 90 Ohio St.3d 403, 414, 739 N.E.2d 300 (2000).  Under such standard, the decision is upheld unless it is unreasonable, arbitrary or unconscionable.  *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

**{¶41}** At the time of the initial hearing, the expert had been a trooper with the Ohio State Highway Patrol for over 26 years.  He was a crime and crash scene reconstructionist

Case No. 21 MA 0083

with almost 1,500 hours in traffic crash and crime scene training. Of those hours, 868 were specific to traffic crashes, including 40 specific to the placement of occupants or pedestrians during a crash. (Hrg.Tr. 3-5). The expert taught three levels of courses in crash investigation. (Hrg.Tr. 6). He had previously been qualified to testify as an expert in accident reconstruction in Columbiana, Mahoning, and Trumbull Counties. (Hrg.Tr. 5-6).

{¶42} The expert's CV shows he engaged in low level accident reconstruction prior to 2004, at which time he trained in crash reconstruction and began serving as an accident reconstructionist. (St.Ex. 1). He completed over 300 reconstruction cases for local, state, and federal agencies between 2004 and 2017. He also served as a reconstruction training officer for new investigators and developed protocols for the reconstruction unit. His training courses were listed on the CV. At trial, he again reviewed his qualifications as an expert, noting he was a full-time crash and crime scene reconstructionist since 2012. (Tr. 734-740).

{¶43} As the state points out, the expert's qualifications in accident reconstruction were established to a greater degree than those in a prior case where we found an officer was properly qualified to testify on accident reconstruction. *See State v. Brady*, 7th Dist. Mahoning No. 13 MA 88, 2014-Ohio-5721, ¶ 46 (where a police officer of 20 years was assigned to the accident investigation unit for 13 years, took a reconstruction course, and was previously qualified as a reconstruction expert). *See also State v. DeWalt*, 7th Dist. Carroll No. 08 CA 852, 2009-Ohio-5283, ¶ 24 (finding a trooper was qualified as an accident reconstruction expert where he took courses on the subject and previously testified as an expert on the subject six times).

{¶44} Here, we have an Ohio State Highway Patrol trooper with a quarter century of accident investigation experience who was trained in reconstruction, worked in the crash and crime scene reconstruction unit since 2004, was a full-time crash and crime scene reconstructionist since 2012, completed reconstructions in over 300 cases, and was previously qualified as an expert in at least three counties. The trial court did not abuse its discretion in finding the state's expert was qualified to testify on accident reconstruction.

**{¶45}** Appellant next contends the expert's reconstruction methods were not established to be reliable under Evid.R. 702(C) and the principles in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Appellant claims there was no proof the results were subject to replication. He points out the decedent's location in the vehicle at the time of the crash was a central issue in the case. In citing case law on expert testimony, he also mentions the testimony must be relevant and with a probative value that is not outweighed by the risks of unfair prejudice, confusing the issues, or misleading the jury.

**{¶46}** An expert's testimony must be based on "reliable scientific, technical, or other specialized information." Evid.R. 702(C). If the testimony reports the result of a procedure, test, or experiment, then it is reliable only if: (1) the theory is objectively verifiable or validly derived from widely accepted knowledge, facts, or principles; (2) the design reliably implements the theory; and (3) it was conducted in a way that will yield an accurate result. Evid.R. 702(C)(1)-(3).

**{¶47}** In determining whether the opinion of an expert is reliable, the trial court examines whether the expert's conclusion is based on scientifically valid principles and methods, not whether the opinion is correct. *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 611-613, 687 N.E.2d 735 (1998) (reversing the trial court's exclusion of an expert opinion), citing *Daubert*, 509 U.S. at 592-593, 595. Factors to consider when evaluating the reliability of scientific evidence include whether the theory or technique has been tested and/or subjected to peer review, the potential rate of error, and whether the methodology is generally accepted. *Miller,* 80 Ohio St.3d at 611 (the inquiry is flexible), citing *Daubert*, 509 U.S. at 593-594.

**{¶48}** The expert testified the speed calculation is a simple, long-standing concept taught in basic courses (and is even taught in courses that do not rise to the level of accident reconstruction). He explained the equation inputs (for the friction factor of the surface and the distance the vehicle traveled over the surface). (Hrg.Tr. 18). He additionally mentioned using a 3D laser scan and forensic mapping to record the condition of the vehicle and the scene; he also took photographs while he evaluated the vehicle at the scene. (Hrg.Tr. 9, 20-21). The expert explained his knowledge, gained from training and experience, that ejection from a vehicle likely leaves evidence at the edges of the

opening, such as the fabric abrasion at the corner of the sunroof. He also explained how clothing imprint marks are left on a dashboard from an impact during a crash, noting this is a common occurrence on the inside and outside of vehicles when a person collides with a vehicle surface at high velocity. (Hrg.Tr. 23-25).

**{¶49}** The accident reconstruction expert said his methods, techniques, equations, and tools were generally accepted throughout the world in the field of accident reconstruction and investigation and were not unique. (Hrg.Tr. 31). Moreover, his report was subjected to peer review by a supervisor in order to lower the error rate and verify the conclusions such as the rolling of the vehicle. (Hrg.Tr. 30, 47, 49). At trial, he reiterated much of his experience and the process utilized. In addition, the evidence he relied on was viewable by the fact-finder in photographs and in maps he was trained to make (including the damage to and features of the outside and inside of the vehicle, the tire marks and gouges in the ground, the debris field, and the damage to the clothing and skin).

**{¶50}** Merely because the expert could not say the accident "absolutely" occurred as he described or could not say a future accident would always happen in this same manner did not mean the reconstruction opinion was unreliable as to this particular accident considering all of the circumstances before the expert. Moreover, the consideration of reproducible results relates to the conclusion of an expert who employs a test or method for the facts at issue. The final interpretation of all existing data was not an experiment; nor was it a test in and of itself. We also note the expert voiced his conclusion to a reasonable degree of scientific certainty. A "reasonable certainty" is synonymous with "probability" not absolutes. *State v. Jackson*, 92 Ohio St.3d 436, 751 N.E.2d 946 (2001). In fact, "expert witnesses in criminal cases can testify in terms of possibility rather than in terms of a reasonable scientific certainty or probability." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 77 (applying the probability standard only to civil cases is constitutionally sound), citing *State v. D'Ambrosio*, 67 Ohio St.3d 185, 616 N.E.2d 909 (1993). Issues with the certainty of the scientific opinion are matters of sufficiency or weight of the evidence. *Id.*

**{¶51}** Appellant also briefly complains the expert failed to mention whether the occupants could have dislodged from their seats before the vehicle impacted the tree or

evaluate whether the side airbags could have inadvertently deployed before the impact, noting there was a front airbag recall based on inadvertent deployment. He also says the expert failed to consider the tree strike in making certain conclusions, such as on trajectory. As to the latter argument, we note the trajectory was supported by evidence such as tracks, ground gouges, debris field, and vehicle condition and position. Also, the expert explained the general equation was based on friction without accounting for strikes; it was not some omission on his part. (Hrg.Tr. 41). The other subjects involve unsupported theories raised by Appellant at trial. These were topics for cross-examination and for the jury in weighing the evidence. For instance, there is no indication a front airbag recall (issued for inadvertent deployment of a front airbag) had any relation to the deployment of the side airbags in this case (where the front airbags were not deployed). Again, the credibility of the expert and the weight to give his conclusions remained issues for the trier of fact. *Brady*, 7th Dist. No. 13 MA 88 at ¶ 45.

**{¶52}** The trial court reasonably found the expert's opinion was reliable under Evid.R. 702(C), and the decision was not arbitrary or unconscionable. Moreover, the testimony was relevant under Evid.R. 401, and the probative value was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury under Evid.R. 403(A). In sum, the trial court's decision to find the trooper was qualified to testify as an expert in accident reconstruction and to allow him to testify about the accident and the decedent's location in the vehicle was not an abuse of discretion. Accordingly, this assignment of error is overruled.

ASSIGNMENT OF ERROR TWO: HEARSAY

**{¶53}** Appellant's second assignment of error alleges:

"THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY PERMITTING VARIOUS WITNESSES TO TESTIFY THAT THE DECEDENT STATED THAT APPELLANT WAS THE 'BEST DRUNK DRIVER' HE KNEW."

**{¶54}** As set forth supra in our Statement of the Case, the decedent asked for a ride home from people other than Appellant at the end of the night. Dante was getting a ride home from Jackie, but he offered to summon an Uber for the decedent. At that point, Appellant said he could transport the decedent and would be leaving soon. Dante suggested the decedent should decline the ride. The defense unsuccessfully objected

when Dante quoted the decedent as follows: "don't worry, Mike's the best drunk driver I know." The decedent and Appellant thereafter walked out of the bar. (Tr. 270-273).

**{¶55}** Macy separately voiced her concerns about the decedent's ride home due to Appellant's intoxication. She testified over objection that the decedent told her Appellant was going to drive them. The court overruled the objection after the state pointed out it showed the decedent's intent. The state then asked Macy what gave her the impression Appellant would be the driver. The court overruled another defense objection, allowing Macy to testify the decedent told her "[Appellant] is the best drunk driver that he knows." (Tr. 353-354).

**{¶56}** Appellant contends the statement about Appellant being "the best drunk driver" the decedent knew was inadmissible hearsay. He also claims the prejudicial effect outweighed the probative value under Evid.R. 403.

**{¶57}** We begin by pointing out the decedent's statements to his friends before leaving the bar were non-testimonial; the primary purpose of the statements was not to create an out-of-court substitute for trial testimony. *See State v. Ash*, 7th Dist. Monroe No. 16 MO 0002, 2018-Ohio-1139, 108 N.E.3d 1115, ¶ 72-75 (victim's statements to relatives), citing *Ohio v. Clark*, 576 U.S. 237, 135 S.Ct. 2173, 2181, 192 L.Ed.2d 306 (2015) (a statement cannot fall within the confrontation clause unless its primary purpose was testimonial); *Giles v. California*, 554 U.S. 353, 376, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008) (statements to friends not subject to confrontation clause); *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 185 (statement of defendant's daughter to the victim's niece was non-testimonial). This non-testimonial description does not appear to be in dispute.

**{¶58}** Where a non-testimonial statement is admitted, the confrontation clause does not apply, and the matter is left to the application of state rules of evidence such as hearsay rules. *Michigan v. Bryant*, 562 U.S. 344, 358-359, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011). Hearsay, which is generally inadmissible, is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Evid.R. 801(C); Evid.R. 802.

**{¶59}** As below, the state first claims the statement was not hearsay because it was not offered to show Appellant was the best drunk driver the decedent knew.

However, the statement also implicitly indicates Appellant was drunk that night, which was a fact the state was charged with establishing at trial.

**{¶60}** In any case, the state asserts the contested statement would be admissible under the statement of intent exception to the ban on hearsay, which the state also raised at trial in response to the objection. This exception provides the following type of hearsay is admissible:

> Then Existing, Mental, Emotional, or Physical Condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Evid.R. 803(3).

**{¶61}** "[S]tatements of current intent to take future actions are admissible for the inference that the intended act was performed." *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 99 (a declarant's statements that he was going to make money and "take somebody out" for the defendant, he had to be ready to go see the defendant, and he would be right back after he picked up some money were admissible under Evid.R. 803(3) to show the declarant intended to meet with the defendant, pick up money, and later kill a person), citing *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 33 (it is a long-standing rule that a statement of then-existing intent may be used as the basis for introducing statements showing the declarant's forward-looking intent to prove he thereafter acted in accordance with that intent).

**{¶62}** As the state points out, the contested statement constituted a part of the declarant's stated intent and plan. Without allowing Dante to testify to the statement, Dante could not have disclosed the decedent's declaration of his plan or intent to accept Appellant's offer of a ride and get in the car with him driving. Presented in the context of the conversation about who was driving the decedent that night, the statement was offered to show the decedent intended to ride with Appellant notwithstanding the concerns over his drunkenness. By the time Macy testified, the same statement was already in the record.

Case No. 21 MA 0083

**{¶63}** It was not an abuse of discretion for the trial court to conclude the decedent's reassurances to his concerned friends not to worry because Appellant was the best drunk driver he knew demonstrated the decedent's "current intent to take future actions" and were "admissible for the inference that the intended act was performed." *See Hand*, 107 Ohio St.3d 378 at ¶ 99. As such, the decedent's statements indicating he was accepting Appellant's offer of a ride were admissible under Evid.R. 803(3) to prove he then acted in conformity with his expressed intent.

**{¶64}** The decedent's intent to get a ride with Appellant notwithstanding his intoxication was certainly relevant evidence. *See* Evid.R. 401 (relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). The admission or exclusion of relevant evidence under Evid.R. 403(A) is within the sound discretion of the trial court. *State v. Skatzes*, 104 Ohio St.3d 195, 819 N.E.2d 215, 2004-Ohio-6391, ¶ 107.

**{¶65}** When an otherwise admissible statement is relevant, it shall be excluded if its probative value was not *substantially* outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 403(A). The contested statement would not have confused or misled the jury. It was admittedly prejudicial, including the implication that the decedent may have witnessed Appellant drive drunk in the past. Still, it is only *unfair* prejudice to be weighed against the probative value, as the state's evidence will obviously prejudice a defendant. *Skatzes*, 104 Ohio St.3d 195 at ¶ 107. The jury already heard from Dante that Appellant drove him and the decedent to the bar after Appellant consumed at least one mixed vodka drink and smoked marijuana. Plus, the probative value of the statement evincing the decedent's intent to ride with Appellant was very high. It was reasonable to find the probative value of the statements was not substantially outweighed by the danger of unfair prejudice.

**{¶66}** Finally, the state also persuasively contends that assuming arguendo there was a hearsay error in admitting the contested statement, any error would have been harmless. Appellant drove the decedent to the bars in a wild manner while driving a Mercedes owned by Appellant's father. As mentioned in reviewing prejudice, the jury already heard from Dante that Appellant consumed at least one mixed vodka drink and

smoked marijuana before driving them to the bar. Various witnesses saw him drink more at the bars and watched him act drunk, with his staggering and fall captured on video for the jury. When the decedent sought a ride from people at the end of the night, Appellant specifically declared that he would drive the decedent, and they then left the bar together. Appellant's offer of the ride to the decedent was the defendant's own statement and was thus non-hearsay. Evid.R. 801(D)(2)(a).

**{¶67}** Moreover, before Macy revealed the "best drunk driver" statement, she had already disclosed the decedent said he would be driven by Appellant that night. In addition, the bar's video (from less than 10 minutes before the crash) showed Appellant entering the vehicle through the driver's door with the decedent entering on the passenger side. With these facts and the remainder of the facts collected in our Statement of the Case, it is clear any error in admitting the alleged hearsay statement would have been harmless as there was overwhelming evidence that Appellant was both intoxicated and the driver. *See State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 32 (even if there was prejudicial error in admitting evidence, the overwhelming other evidence rendered the error harmless). For the various reasons expressed above, this assignment of error is overruled.

ASSIGNMENT OF ERROR THREE: FLIGHT INSTRUCTION

**{¶68}** Appellant's third assignment of error states:

"THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY GIVING A FLIGHT INSTRUCTION TO THE JURY OVER THE OBJECTIONS OF APPELLANT."

**{¶69}** Defense counsel objected to a flight or consciousness of guilt instruction before the jury was charged. The court overruled the objection and gave the following jury instruction:

> Testimony has been admitted indicating that the defendant fled the scene. You are instructed that fleeing the scene alone does not weigh the presumption of guilt, but it may tend to indicate the defendant's consciousness of guilt.
>
> If you find that the facts do not support the defendant leaving the scene or if you find that some other motive prompted their conduct, or if you

find that, or if you are unable to decide what his motive was, then you should not consider this evidence for any purpose.

However, if you find that the facts support that the defendant engaged in such conduct, and you decide that it was motivated by consciousness of guilt you may, but are not required to consider that evidence in deciding whether or not he is guilty of the crime charged. You alone will determine what weight, if any, to give to this evidence.

(Tr. 979-980).

**{¶70}** A trial court's decision to provide a particular jury instruction based upon the facts of the case will not be reversed absent an abuse of discretion, requiring the decision to be unreasonable, arbitrary or unconscionable. *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989). It is well-established "that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." *State v. Williams*, 79 Ohio St.3d 1, 11, 679 N.E.2d 646 (1997). Clearly, flight from a crash scene qualifies as a type of flight. *State v. Miller*, 7th Dist. Mahoning No. 13 MA 12, 2014-Ohio-2936, ¶ 139 (fleeing the scene instead of calling for ambulance), citing *State v. Eaton*, 19 Ohio St.2d 145, 160, 249 N.E.2d 897 (1969) ("Flight from justice, and its analogous conduct, have always been indicative of consciousness of guilt"), overruled in part on other grounds, *Eaton v. Ohio*, 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 750 (1972) (vacating death penalty).

**{¶71}** Appellant argues a flight instruction was not warranted because he merely left the scene, claiming he took no affirmative step to avoid the police. He relies on the following Eighth District holding: "a flight instruction should not be given when a defendant merely departs from the scene of a crime, unless deliberate flight is proven, such that the defendant took affirmative steps to avoid detection and apprehension." *State v. Keller*, 8th Dist. Cuyahoga No. 106196, 2018-Ohio-4107, ¶ 63. The court distinguished between mere departure from the scene and fleeing from the scene, which is a deliberate act of avoiding detection or evading the police. *Id.* at ¶63-64. Although the Eighth District found the instruction should not have been given, the court then found a lack of prejudice to the defense and affirmed the conviction. *Id.* at ¶ 65-66.

Case No. 21 MA 0083

{¶72} The facts of the *Keller* case have no similarity to the case at bar. The victim in *Keller* said: she was drinking at various places with the defendant and others; she passed out at 6:00 a.m. next to the defendant on the couch at her friend's house; the defendant raped her while she was passed out; he was sleeping when she woke up to her alarm; and he left the house while she was in the bathroom. That defendant testified the sex was consensual and he left after waking up at 9:00 a.m. because he was embarrassed (with the victim's boyfriend sleeping on the other couch).

{¶73} Here, Appellant did not merely depart from the scene of an accident involving a vehicle owned by his father. There was evidence he used the vehicle to drive to bars that night after he had an alcoholic drink and smoked marijuana; there was also evidence he drank at two bars and was intoxicated at the end of the night at the final bar. His friend was fatally injured in the accident, but he did not call 911 or seek assistance from the nearby houses. Instead, he walked or ran quite a distance to reach his house. According to video evidence, it took him ten minutes to walk to his house from the Route 46 intersection. This was in addition to the walk from the crash site to that recorded intersection, which seemed to be a similar distance. Then, when Appellant arrived home, he still did not call 911. Instead, he obtained another vehicle to drive back to the scene where he dragged the decedent's body into his vehicle and left the scene a second time. Appellant then went home again where the body stayed for 25 minutes in his car (until his father drove the car to an emergency care center).

{¶74} Furthermore, the police arrived at Appellant's house mere minutes after his father left. When they knocked, Appellant was in the kitchen. Appellant looked at the officer through the window and walked away down a hallway instead of answering the door. He peeked around the corner at the officer minutes later, still refusing to answer the door despite ten minutes of knocking. The police subsequently learned of the fatality after the father reached the emergency center.

{¶75} Collectively, the situation was more than mere departure from a scene; there was evidence of deliberate acts of evasion, concealment, and delay (potentially in order to provide time to come up with a story or to postpone alcohol testing). The reason behind Appellant's departure from the scene and related conduct thereafter was a jury question. It was not an abuse of discretion to conclude that Appellant's conduct could

rationally be viewed as constituting flight or "analogous conduct" after crashing a vehicle while under the influence, warranting a consciousness of guilt instruction. *See Eaton*, 19 Ohio St.2d at 160.

**{¶76}** Moreover, the jury was specifically instructed that if the defendant's conduct of leaving the scene was prompted by some motive other than consciousness of guilt, then they should not consider the conduct. In formulating the jury instructions, the court was not required to accept the theory from Appellant's opening statement that he was merely "stupid" by trying to "help" his friend in this manner (or his claim to a trooper that he was not the driver). The court did not abuse its discretion in providing the consciousness of guilt instruction on flight. The instruction would not have prejudiced the defense in any event under the totality of the evidence as reviewed in our Statement of the Case and throughout this Opinion; contrary to his argument, the other evidence showing he was the driver was not weak but was overwhelming. This assignment of error is overruled.

ASSIGNMENT OF ERROR FOUR:  WEIGHT

**{¶77}** Appellant's fourth and final assignment of error contends:

"APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

**{¶78}** Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Thompkins*, 78 Ohio St.3d at 387. Although the effect of the evidence in inducing belief is evaluated, weight of the evidence is not a question of mathematics. *Id.* A weight of the evidence review considers whether the state met its burden of persuasion. *Id.* at 390 (Cook, J., concurring) (as opposed to the burden of production involved in a sufficiency review). The trier of fact occupies the best position from which to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

**{¶79}** When a defendant claims a conviction is contrary to the manifest weight of the evidence, the appellate court is to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether,

in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins*, 78 Ohio St.3d at 387. Where a case was tried by a jury, only a unanimous appellate court can reverse on manifest weight of the evidence grounds. Ohio Constitution, Article IV, Section 3(B)(3). The power of the court of appeals to sit as the "thirteenth juror" is limited in order to preserve the jury's primary function of weighing the evidence. *Thompkins*, 78 Ohio St.3d at 389.

**{¶80}** Appellant contends there was "scant" evidence he was driving at the time of the crash. He suggests the only evidence he was driving at the time of the accident was the opinion of the accident reconstruction expert and criticizes this testimony because he testified his report was based on a wet road. Appellant construes the testimony of the first responding officer as stating the road was dry.

**{¶81}** First, we note the first responding officer was asked about "the weather conditions" upon her arrival, not the road condition, and she responded by saying, "It was dry out" when she arrived on the scene. (Tr. 383-384). We also note she said it was pouring heavy rain when a trooper arrived approximately five minutes later. (Tr. 384, 394). The trial was held almost four years after the accident, and the first responding officer did not make a report of the accident. (Tr. 393).

**{¶82}** Notably, closer to the time of the crash, rain is depicted in the videos showing the subject walking from the direction of the crash site on Shields Road and the car driving toward the scene (before the first responding officer would have arrived on the scene). The trooper who reviewed this video from the business on Route 46 noted it was raining or sleeting in the video and windy. (Tr. 703). The trooper who reviewed the video from a Timber Run Drive neighbor noted the video showed light rain was falling during the portion viewed. (Tr. 584). In addition, the accident reconstructionist said he consulted the weather conditions reported from the local airport and concluded the conditions were wet at the time of the accident. (Tr. 785, 808). In any event, he pointed out that if the conditions were dry, then he would have concluded the vehicle was driving even faster. (Tr. 815). There was no indication this would have affected the expert's conclusion on the passenger's position in the vehicle.

Case No. 21 MA 0083

**{¶83}** Appellant next notes the forensic pathologist testified she could not match the decedent's injuries to a place on the vehicle. (Tr. 549). However, she did not view the vehicle, the crash site, or photographs of the vehicle or scene. (Tr. 550). She also received the body unclothed. (Tr. 547, 551). Moreover, she did not attempt to make such connections in evaluating the decedent.

**{¶84}** Appellant says the passenger's injuries were consistent with him being the driver, pointing to injuries to the torso (lacerated liver and aortic arch, fractured ribs, contused lungs surrounded by blood in the pleural cavity, blood in the abdomen). However, there was no testimony so opining, and one could just as freely conclude the injuries were consistent with being an unbelted passenger being thrown forward and to the left through the vehicle and partially through the sunroof as the vehicle rolled on its top and continued rolling until his ejection.

**{¶85}** The accident reconstruction expert explained his conclusions on the passenger's trajectory and why he believed to a reasonable degree of scientific certainty that the decedent was the passenger and not the driver. It was within the jury's province to find the testimony worthy of belief. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. "When more than one competing interpretation of the evidence is available and the one chosen by the jury is not unbelievable, we do not choose which theory we believe is more credible and impose our view over that of the jury." *State v. Baker*, 7th Dist. Mahoning No. 19 MA 0080, 2020-Ohio-7023, ¶ 148, citing *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

**{¶86}** Moreover, we reiterate the other evidence suggesting Appellant was the driver. The vehicle was a Mercedes SUV registered to Appellant's father. Before driving to the first bar, Appellant had at least one mixed drink and smoked marijuana. He then drove the decedent, Dante, and another friend to Blue Wolf Tavern in this vehicle three hours before the accident. He was seen drinking beer at Blue Wolf, and he later moved his vehicle from Blue Wolf to Suzie's Dogs and Drafts (rather than walking over as other patrons did). As the lights came on after last call at Suzie's Dogs and Drafts, Appellant

was heard offering to drive the decedent while the decedent was seeking a ride from other sources. Five hours after the crash, Appellant told a trooper the decedent argued with him in the parking lot at Suzie's about who would drive and the decedent ended up driving. However, the decedent's statements of intent minutes before exiting the bar indicate he intended to leave with Appellant as the driver.

**{¶87}** In any event, at approximately 2:39 a.m., the video shows Appellant leaving Suzie's Dogs and Drafts and directly entering the driver's door of his father's vehicle while the decedent entered on the passenger side. Appellant's brief theorizes they may have switched position somewhere else after he drove away from the bar. However, circumstantial evidence inherently possesses the same probative value as direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001).

**{¶88}** Furthermore, a resident near the crash site testified the crash occurred around 2:46 a.m. A trooper testified it took him seven minutes to arrive at the crash site from Suzie's Dogs and Drafts when driving the speed limit (taking the route down Tippecanoe Road to Shields Road).

**{¶89}** In addition, Appellant left the scene of the crash on foot and fled to his house, which was not a short walk. Appellant did not call 911 from at or near the scene, and he did not call 911 when he arrived home. Instead, he retrieved another vehicle, drove to the scene, dragged the decedent's body into the vehicle, and returned to his house where the decedent remained for 25 minutes (until Appellant's father drove the decedent to a health center). Besides finding blood in the back seat, troopers also found blood on an object in the trunk. Additionally, Appellant ignored the police when they repeatedly knocked on his door just after his father left with the decedent's body; the officer first saw Appellant look at him when the knocking started and a second time when Appellant later peeked down the hallway. Again, it was for the jury to evaluate what Appellant's post-crash behavior suggested. As reviewed supra, there was weighty evidence showing Appellant's intoxication as well.

**{¶90}** Finally, the jury considered Appellant's observation that there was no indication of when the clocks on the surveillance videos lost track of actual time. Four out of the five surveillance videos were found to be off from actual time. The three videos from after the crash correlate neatly once adjusted for actual time, and the videos were

collected just days after the accident. Also, the video from Suzie's Dogs and Drafts was collected within two weeks of the crash, and the adjusted time corresponded with witness testimony and with the Blue Wolf Tavern video, which was found to have accurate time.

**{¶91}** A thorough review of the record does not indicate this is the "exceptional" case in which the evidence weighs "heavily" against the conviction and requires the exercise of our limited "thirteenth juror" discretion to grant a new trial. *See Lang*, 129 Ohio St.3d 512 at ¶ 220. Accordingly, the decision to convict Appellant of the offenses was not contrary to the manifest weight of the evidence. This assignment of error is overruled.

**{¶92}** For the foregoing reasons, Appellant's convictions are affirmed.

Waite, J., concurs.

Wilkin, J., concurs.

[Cite as *State v. Malvasi*, 2022-Ohio-4556.]

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**