[Cite as *State v. Borsos*, 2024-Ohio-3204.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## BELMONT COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

DARRIN SCOTT BORSOS,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 23 BE 0048

---

Criminal Appeal from the
Court of Common Pleas of Belmont County, Ohio
Case No. 23 CR 220

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. J. Kevin Flanagan,* Belmont County Prosecutor*, Atty. Jacob A. Manning,* Assistant Prosecuting Attorney for Plaintiff-Appellee and

*Atty. Robert T. McDowall Jr.,* Robert T. McDowall Co., LLC for Defendant-Appellant.

Dated:  August 16, 2024

**Robb, P.J.**

**{¶1}** Defendant-Appellant Darrin Scott Borsos appeals his felony conviction entered after a jury trial in the Belmont County Common Pleas Court. He argues the jury verdict finding him guilty of failure to comply with an order or signal of a police officer was contrary to the manifest weight of the evidence, challenging the identity of the driver and vehicle, the applicable mens rea, and whether the "operation of the vehicle caused a substantial risk of serious physical harm to persons or property." For the following reasons, Appellant's conviction is affirmed.

STATEMENT OF THE CASE

**{¶2}** Appellant was indicted for failure to comply with an order or signal of a police officer for "operat[ing] a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop." R.C. 2921.331(B). The offense was a third-degree felony due to the additional allegation that "[t]he operation of the vehicle caused a substantial risk of serious physical harm to persons or property." R.C. 2921.331(C)(5)(a)(ii).

**{¶3}** At the jury trial, a police officer testified he was stopped in his cruiser while monitoring traffic coming from West Virginia's Wheeling Island into the State of Ohio at Bridgeport on the night of July 2, 2023. (Tr. 235). Two males in a red older model Jeep passed his position. The officer said he had a good view inside the vehicle because it did not have the top installed. (Tr. 236-237, 246). According to the officer's testimony, the driver was a skinny white male in his late 40's to mid-50's with no beard and wearing a red shirt. (Tr. 247). He said the passenger was a smaller white male wearing a bandana. (Tr. 248).

**{¶4}** Upon leaving his patrol position, the officer happened to end up behind the Jeep on U.S. Route 250. (Tr. 236). He opined the occupants acted "as if they thought I was going to pull them over." (Tr. 236). While in a 25 mile per hour zone, the Jeep began traveling at a high rate of speed, which the officer estimated at 40 to 45 miles per hour. (Tr. 239-240). Although the road was divided by a double yellow line, the Jeep "went into oncoming traffic to pass a vehicle in front and then they accelerated even more . . ." (Tr.

240-241). The officer activated his lights, and when the vehicle continued to accelerate, he activated his sirens. (Tr. 240-241).

{¶5} At 9:14 p.m., he radioed his pursuit to the dispatcher, stating a red Jeep was not stopping. Although the speed limit increased to 45 miles per hour, the Jeep was reported to be traveling at 62 miles per hour. (Tr. 239, 245). The officer was unable to read the license plate number and the cruiser eased back after the driver reached under his seat. (Tr. 246). The Jeep proceeded down "skinnier roads, smaller roads" that the cruiser was "having trouble going down" at higher speeds, and there were no road signs. (Tr. 248). For these various safety reasons, the officer terminated the fast pursuit at 9:18 p.m. and then (unsuccessfully) searched for the Jeep while driving at safe speeds. (Tr. 249-250).

{¶6} Around 7:00 a.m. (while the officer was filing his report at the end of his overnight shift), dispatch received a report that a Jeep with no occupants was found wrecked into a tree. (Tr. 250). Photographs from the crash scene were admitted as evidence at trial showing the top half of the crashed Jeep was simply black roll bars; in addition to being open at the roof, it was open at all areas where side and rear windows (and any window framing) would be located. The jeep was black at the tailgate and above the wheels but had red doors and a red hood (a type of hood that wraps down the sides). (St.Ex. 3). Two open cans of alcoholic iced tea were observed in the Jeep. (Tr. 253, 283).

{¶7} When the officer was asked at trial why he reported the Jeep's color as simply red, he said he observed the black parts on the body of the Jeep, but in the midst of a "very stressful situation that was the best description I could give at the time . . ." (Tr. 262-263). When asked if he had any doubt about whether the crashed Jeep was the one he chased, the officer answered, "That is 100 percent the Jeep." (Tr. 252).

{¶8} The Jeep's VIN (vehicle identification number) identified Appellant as the owner. The license plate was registered to a vehicle owned by Appellant's wife. The officer observed Appellant's name and address on papers in the passenger area (including the vehicle registration and mail). (Tr. 253-257). The address was less than a mile from the crash site. (Tr. 258).

Case No. 23 BE 0048

{¶9} The body cam footage showing the officer's experience at Appellant's house was played for the jury. (Tr. 260). Appellant's wife answered the door. She agreed to secure the dog and retrieve Appellant from the basement. Some shouting could be heard from the house. She thereafter returned to inform the officer Appellant was fleeing by way of the back door. (Tr. 287). The officer ran around the house and yelled at Appellant as he exited the back door of the garage.

{¶10} Instead of stopping, Appellant fled back into the house (first through the back door of the garage and then through a door from the garage into the basement). (Tr. 263-263). He would not obey orders to exit the house. At that point, backup was summoned. Appellant was eventually retrieved from his hiding spot behind a couch in the basement. (Tr. 267). His hand had a cut that was bleeding. (Tr. 269). He denied being involved in the pursuit, claiming he was at a friend's house the prior evening. (Tr. 268). When asked about his favorite beverage, Appellant provided the name of the brand of alcoholic iced tea found open in the Jeep. (Tr. 269).

{¶11} From the stand, the officer positively identified Appellant as the driver of the Jeep. After emphasizing his opinion that Appellant's face matched the driver's face, he added, "I have no doubt." (Tr. 269-270). The officer also noted he pays great attention to the driver's face when monitoring traffic entering the state. (Tr. 274). Regarding his attempt to find the passenger, he asked dispatch to call hospitals for reports of a head injury and later attempted to obtain a statement from a person he believed was the passenger. (Tr. 270-271, 279).

{¶12} A trooper who conducted the crash scene investigation also described the Jeep as red in his report, noting red was the color that "stood out . . . the most" even if the Jeep had more black parts than red parts. (Tr. 225, 230). He testified the Jeep would have been traveling up a hill on a two-lane mixed gravel road when it approached a left-hand curve, went off the right side of the road into a ditch, and struck a tree. (Tr. 205, 211-212). Both airbags were deployed. The windshield was cracked on the passenger side from the inside of the vehicle, which the trooper opined was caused by an occupant's body during the collision. (Tr. 217-218, 222).

{¶13} Appellant's wife testified. She believed Appellant bought the Jeep in 2015 and later changed the registration to her name. (Tr. 294). She said the red doors and

red hood were a recent addition and the Jeep had been at a man's house for transmission work for some months. (Tr. 293-298, 309). At 5:30 p.m. on the evening of the police chase, Appellant borrowed her Durango to check the status of his Jeep. (Tr. 298-299). At the time, Appellant was living in the basement of their house, and she did not see him again until the next morning when the police arrived. (Tr. 298).

**{¶14}** When she woke Appellant to inform him the police were at the door, "he jumped off the couch, and started to panic, basically, and was running through the house trying to get out . . . He said to me that he wasn't going to go back to jail, and he kept telling me to be quiet because he was trying to run." (Tr. 302-303). Appellant's wife confirmed his beverage of choice is the brand of alcoholic iced tea found open in the crashed Jeep. (Tr. 299). She also said the Jeep was never reported as stolen. (Tr. 314).

**{¶15}** The jury found Appellant guilty as charged. After ordering a presentence investigation, the court sentenced Appellant to 30 months in prison. The within timely appeal followed.

ASSIGNMENT OF ERROR

**{¶16}** Appellant's assignment of error provides:

"THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT SENTENCED APPELLANT FOR A CONVICTION THAT WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE, IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION."

**{¶17}** Weight of the evidence deals with the effect of the evidence in inducing belief; it concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). A manifest weight of the evidence review considers whether the state met its burden of persuasion. *Id.* at 390 (Cook, J., concurring) (as opposed to the burden of production involved in a sufficiency or legal adequacy review). When a defendant claims the conviction is contrary to the manifest weight of the evidence, the appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest

miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Lang*, 2011-Ohio-4215, ¶ 220, citing *Thompkins* at 387.

**{¶18}** Nevertheless, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 2011-Ohio-6524, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. This is because the trier of fact occupies the best position from which to weigh the evidence and judge witness credibility by observing gestures, voice inflection, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). When more than one competing interpretation of the evidence is available and the one chosen by the fact-finder is not unbelievable, we do not choose which theory we believe is more credible and impose our view over that of the trier of fact. *State v. Baker*, 2020-Ohio-7023, ¶ 148 (7th Dist.), citing *State v. Gore*, 131 Ohio App.3d 197, 201 (7th Dist. 1999).

**{¶19}** Notably, if a case was tried to a jury, an appellate court is prohibited from exercising its discretion to reverse the verdict on grounds of manifest weight of the evidence unless all three judges on the panel agree. *Thompkins* at 389, citing Ohio Const., art. IV, § 3(B)(3). The power of the court of appeals to sit as the "thirteenth juror" is limited in order to preserve the jury's role with respect to issues surrounding the credibility of witnesses and the weight of the evidence. *Id.* at 387, 389. Circumstantial evidence inherently possesses the same probative value as direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485 (2001).

**{¶20}** Appellant contends the jury lost its way in concluding he was the driver of the Jeep, suggesting the officer's identification of both the Jeep and its driver lacked credibility. The officer directly testified that the crashed Jeep "is 100 percent the Jeep" he chased hours earlier. (Tr. 252). The crashed Jeep was found early the next morning in the area of the chase. The officer was able to view the Jeep as it drove into the state past his patrol position and while it was fleeing from him. The officer reported the Jeep being pursued was red; however, he testified he also noticed the black body parts during the chase. The crash scene investigator and the photographs confirm the red hood and doors were prominent features on the crashed Jeep notwithstanding the black tailgate and fender areas. The crashed Jeep lacked a roof and sides, as did the chased Jeep. The chased Jeep contained a front seat passenger. Correspondingly, the crashed Jeep

had the front airbags deployed at both the driver's seat and the passenger's seat, and the windshield sustained heavy damage from the inside on the passenger side. The officer's credibility is best left for the jury, and their determination that the crashed Jeep was the chased Jeep was not contrary to the manifest weight of the evidence.

{¶21} As to Appellant's identity, the crashed Jeep belonged to him. The VIN identified Appellant as the owner, with a license plate registered to his wife. Paperwork scattered around the vehicle displayed Appellant's name and address. Appellant's wife positively identified the crashed vehicle as Appellant's Jeep. A few hours prior to the chase, he told her he was going to check on this Jeep, which had been undergoing repairs. This indicated his intent to be in the presence of his Jeep just prior to the chase. Moreover, the crashed Jeep was found very close to Appellant's residence. Cans of Appellant's preferred type and brand of alcoholic beverage were open in the Jeep.

{¶22} The morning after the chase, Appellant had a fresh cut on his hand. In addition, when Appellant's wife informed him the police were at the front door that morning, Appellant made a statement indicating he feared they were there to arrest him, fled through the back door of his residence, retreated into the residence after the officer yelled for him to stop, and then hid behind a couch. It is well settled that this type of conduct can be considered as an indicator of consciousness of guilt and thus guilt itself. *State v. Williams*, 79 Ohio St.3d 1, 11 (1997); *State v. Malvasi*, 2022-Ohio-4556, ¶ 70 (7th Dist.).

{¶23} Furthermore, the officer specifically testified that Appellant's face matched the face of the driver. The officer pointed out he had a good view inside the Jeep as it passed and while he followed it, because it lacked a roof and sides. Initially, the officer was in a parked vehicle with his headlights shining on the Jeep as it proceeded toward and past his cruiser while he was monitoring traffic. He said he was paying great attention to the faces of the drivers as they entered the state. He noticed the driver of the Jeep was a skinny white male in his late 40's to mid-50's with no beard and wearing a red shirt. After pulling out behind the Jeep and subsequently while pursuing it, he kept his eyes on the driver through the Jeep's open back (which is how he noticed the driver reaching under his seat).

**{¶24}** After the chase, the officer's next viewing of Appellant was a mere 10 hours later when he arrived at Appellant's house to investigate the crashed Jeep. In positively identifying Appellant as the driver of the Jeep, the officer declared, "I have no doubt." (Tr. 269-270). The jury saw the officer as he testified under oath on the stand; they viewed his voice inflection, gestures, and demeanor. It was within their province to believe his assertions, especially when combined with the weight of the circumstantial evidence existing in this case.

**{¶25}** Appellant also contends the jury lost its way in weighing the evidence on the enhancement raising the level of the offense to a third-degree felony. The statute defining the offense of failure to comply with an order or signal of a police officer states, "No person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop." R.C. 2921.331(B). The offense is a third-degree felony where "[t]he operation of the vehicle caused a substantial risk of serious physical harm to persons or property." R.C. 2921.331(C)(5)(a)(ii).

**{¶26}** Initially, we reject Appellant's argument that a reckless mental state applies to division (C)(5)(a)(ii). Appellant relies on a Second District case *addressing an offense under division (A)* of R.C. 2921.331 ("No person shall fail to comply with any lawful order or direction of any police officer invested with authority to direct, control, or regulate traffic"). *See State v. Brewer*, 96 Ohio App.3d 413 (2d Dist. 1994) (stating R.C. 2921.331(A) is not a strict-liability offense and thus has a mens rea of recklessness).

**{¶27}** However, Appellant was convicted under division (B) of R.C. 2921.331 with the penalty enhancer from (C)(5)(a)(ii). As the Supreme Court has concluded, R.C. 2921.331 plainly indicates culpability is not required for the penalty enhancer in division (C)(5)(a)(ii). *State v. Fairbanks*, 2008-Ohio-1470, ¶ 13-14; *State v. Bunch*, 2013-Ohio-3748, ¶ 1, 7 (4th Dist.) (third-degree felony penalty enhancement in (C)(5)(a)(ii) imposes strict liability).

**{¶28}** By way of explanation, we point out division (B) of R.C. 2921.331 initially specifies the mental state of willfully for the element of eluding or fleeing. A mental state is not subsequently specified in the penalty enhancer applicable to division (B). *See* R.C. 2921.331(C)(5)(a)(ii) ("The operation of the vehicle caused a substantial risk of serious

physical harm to persons or property"). Different mental states may apply to different elements of the same offense. *Fairbanks* at ¶ 14. Pursuant to statute, "When the section defining an offense does not specify any degree of culpability, and plainly indicates a purpose to impose strict criminal liability for the conduct described in the section, then culpability is not required for a person to be guilty of the offense." R.C. 2901.21(B). When the section neither specifies culpability nor plainly indicates a purpose to impose strict liability, recklessness is sufficient culpability to commit the offense. *See id.* at (B)-(C). Accordingly, the Supreme Court explained:

> R.C. 2921.331(C)(5)(a)(ii) is not an element that has a specified culpable mental state. Instead, the penalty enhancement is contingent upon a factual finding with respect to *the result or consequence* of the defendant's willful conduct. Whether the result or consequence was intended by the defendant is of no import. If the trier of fact finds beyond a reasonable doubt that a substantial risk of serious physical harm to persons or property actually resulted from the defendant's conduct, then the enhancement is established. This is purely a question of fact concerning the consequences flowing from the defendant's failure to comply. It involves no issue of intent or culpability, and no inquiry into the defendant's state of mind with respect to that element is contemplated or necessary. It is analogous to determining whether the offense occurred in daylight or in darkness or whether the place where it occurred was dusty or wet. It is simply a finding of the presence or absence of a condition.

*Fairbanks* at ¶ 11. (Emphasis in original.) Accordingly, the jury was not required to find Appellant recklessly created a substantial risk of serious physical harm, just that he did create this risk.

{¶29} Next, Appellant argues the jury lost its way in finding his operation of the vehicle caused a substantial risk of serious physical harm to persons or property. Suggesting the crash may not have occurred while the Jeep was still in the process of fleeing or eluding the officer, Appellant says there was no specific testimony indicating he nearly caused an accident while he was being chased and says there was "no direct evidence" his illegal driving acts such as speeding caused a substantial risk of serious

physical harm. Reviewing various cases with arguably stronger facts to support convictions that were affirmed on appeal, Appellant points out there was no indication he ran red lights or stop signs.

**{¶30}** We reiterate circumstantial evidence inherently possesses the same probative value as direct evidence. *Treesh*, 90 Ohio St.3d at 485. "Substantial risk" is defined as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8). As the state points out, the vehicle's operation must merely cause a substantial *risk* of serious physical harm to person or property; the operation need not actually or nearly cause serious physical harm. *State v. Morant*, 2021-Ohio-3160, ¶ 49 (7th Dist.); *State v. Billman*, 2010-Ohio-4852, ¶ 34 (7th Dist.), citing *State v. Love*, 2004-Ohio-1422, ¶ 19 (9th Dist.) ("A jury could also reasonably find that the failure of Appellant to engage in a 'near collision' speaks to nothing more than Appellant's good luck and the careful driving on the part of other motorists on the road"). The state also emphasizes, "Ohio appellate courts have repeatedly held that high-speed chases inherently create a substantial risk of physical harm to the driver, officers, and other motorists on the road, since high speeds increase the likelihood and severity of crashes." *State v. Moore*, 2023-Ohio-1904, ¶ 37 (5th Dist.).

**{¶31}** To recap, it was 9:15 p.m. After traveling at speeds of 40 to 45 miles per hour in a 25 mile per hour zone, Appellant improperly passed a car by crossing over a double yellow line during which he "went into oncoming traffic to pass" the vehicle in front of him. Appellant did not stop when the officer signaled to him. He increased his speed to 62 miles per hour when the speed limit was 45 miles per hour on a road that was identified for the jury (including on a map displayed to the jury by the prosecution). The pursuit lasted nearly four minutes before the officer had to end it for safety reasons. The officer alluded to the strong possibility and danger of crashing because the speeds exceeded what was safe for the narrow, hilly backroads. He pointed out his police vehicle (a Tahoe) was "having trouble going down" and maneuvering the "skinnier roads, smaller roads" at those speeds. We also emphasize Appellant had a passenger during the chase. Finally, the recovery of the wrecked and abandoned Jeep early the next morning with a cracked windshield in the passenger position (and open alcoholic beverage cans) can be

considered during the weighing of the evidence on the question of whether there was a substantial risk of serious physical harm due to his operation of the vehicle while willfully fleeing *or eluding* the officer who tried to stop him.

**{¶32}** A thorough review of the record does not indicate this is the "exceptional" case in which the jury "clearly lost its way" and created a manifest miscarriage of justice requiring a new trial; the evidence does not weigh "heavily" against the conviction. *See Lang*, 129 Ohio St.3d 512, at ¶ 220. Accordingly, the jury verdict is not contrary to the manifest weight of the evidence. This assignment of error is overruled.

**{¶33}** For the foregoing reasons, Appellant's conviction is affirmed.

Waite, J., concurs.

Dickey, J., concurs.

———————————————

For the reasons stated in the Opinion rendered herein, the assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Belmont County, Ohio, is affirmed. Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**